**IMAX CORPORATION,**
**Plaintiff–Appellant,**

v.

**CINEMA TECHNOLOGIES, INC.; Neil Johnson, Defendants–Appellees.**

No. 96–16094.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1998.

Decided Aug. 19, 1998.

Robert S. Warren, Gibson, Dunn & Crutcher, Los Angeles, California; Matthew D. Powers, Weil, Gotshal & Manges, Menlo Park, California, for plaintiff-appellant.

William Sloan Coats, Howrey & Simon, Menlo Park, California, for defendants-appellees.

Before: SNEED, KOZINSKI, and THOMPSON, Circuit Judges. ·

SNEED, Circuit Judge:

Capitalism requires that both property rights and vigorous competition, each within the limits fixed by law, coexist. The tension between these two imperatives generates many disputes. This case is concerned with one such dispute.

In this case, Imax Corporation ("Imax") seeks to protect its interests in large format motion picture projectors, generally known as "rolling loop" projectors, with respect to which Imax acquired several patents in the 1970s. Thereafter, it manufactured and sold over 100 "rolling loop" projectors worldwide. Certain of these patents have expired and Imax does not here assert a claim of patent infringement.

Its present claims against Cinema Technologies, Inc. ("CTI"), and Neil Johnson are grounded on the State of California's law of trade secrets and unfair competition.

We affirm the judgment of the district court against Imax with respect to the alleged misappropriation of trade secrets by CTI and Johnson. However, we reverse and remand for further proceedings the judgment of the district court, also against Imax, with respect to its unfair competition claim.

# I.

## BACKGROUND AND PROCEDURAL HISTORY

Imax is the world's largest supplier of "rolling loop" projectors, and until recently it was the only such supplier. In 1971, the Patent and Trademark Office issued the first of several patents relating to the "rolling loop" projector (the "'073 patent"). Imax acquired the rights to several of these patents and went on to manufacture and sell over 100 "rolling loop" projectors worldwide.

The Imax patents did not disclose everything needed to mass-produce its "rolling loop" projector. Therefore, there remained the possibility of trade secrets qualified for protection under state law. To maintain the secrecy of its undisclosed technology, Imax inserted a confidentiality provision in each of its sales or lease agreements forbidding its customers from "disclos[ing] any information ... of a confidential nature concerning the system."

### A. The Formation of NJ Engineering

In June 1988, mechanical engineer Neil A. Johnson, along with David Mariani and Keith Merrill, formed NJ Engineering with the goal of developing a large format projector that would compete with Imax. Mariani and Merrill gave Johnson copies of several of the Imax patents and a service manual obtained from an Imax customer. This manual was not marked confidential. In July 1988, Johnson visited the Imax Theatre at the Los Angeles Museum of Space and Industry. He spent several hours in the projection booth, in the presence of the chief projectionist, observing the operation of the Imax projector. Imax's '073 patent expired in August 1988.

### B. The Post–Expiration Inspections by Johnson's Team

Shortly thereafter, Mariani and Merrill arranged for Johnson and a team from NJ Engineering to inspect an Imax projector at the Great America theme park in Santa Clara, California ("Great America"). Johnson and his colleagues spent two weeks disassembling, photographing, measuring, tracing, and making sketches of various aspects of the Imax projector.[1]

### C. The Inspection in Buenos Aires

In March 1990, Mariani arranged for Johnson to inspect a projector that originally had been sold by Imax to the Parques Interama in Buenos Aires, Argentina. Mariani had indicated that he was interested in purchasing this projector for "reverse engineering" and subsequent resale. Johnson flew to Buenos Aires and met with an individual who claimed to own the projector, and allowed Johnson to inspect the partially disassembled projector over a two-day period.

### D. The Formation of CTI

Johnson's work apparently was successful. In September 1990, NJ Engineering and its subsidiary, World Odyssey, Inc., unveiled its "rolling loop" projector at a trade show in Amsterdam. Almost three years later, in June 1993, Johnson left NJ Engineering and formed Cinema Technologies, Inc. ("CTI"). Shortly thereafter, CTI entered the market with its own "rolling loop" projector. According to Johnson, CTI developed its projector relying solely upon information it knew to be in the public domain and not from information Johnson acquired at NJ Engineering.

### E. District Court Proceedings

On August 31, 1994, Imax filed its suit against CTI and Johnson in which it alleged misappropriation of trade secrets and unfair competition. Imax originally named NJ Engineering as a defendant; however, it later dismissed them without prejudice.[2] Thereafter, CTI moved for summary judgment on the grounds that Imax: (1) failed to identify any trade secrets; (2) placed all of its alleged trade secrets in the public domain; (3) failed

---

1. The district court found that "Imax claims that Mariani and Johnson gained unrestricted access to the booth by misrepresenting the nature of their project to [the head of Great America's theater operations]. Defendants deny any misrepresentation."

2. Imax asserts that a separate suit against NJ Engineering and World Odyssey, Inc. is presently pending before Judge Ingram in the Northern District of California.

to make reasonable efforts to maintain the confidentiality of its alleged trade secrets; and (4) failed to demonstrate any misappropriation. In response, Imax filed a counter-motion requesting partial adjudication that 24 of its alleged trade secrets were not in the public domain.[3]

In granting summary judgment for CTI, the district court's basic premise was that Imax had failed to carry its burden of identifying which "dimensions and tolerances" it claimed as its trade secrets. It noted that such failure entitled CTI to summary judgment on Imax's misappropriation of trade secrets claim. However, the district court did not dispose of Imax's trade secrets claim on precisely that basis. It adjudicated Imax's trade secrets claim in the following manner:

First, the district court excluded all evidence concerning the precise numerical dimensions and tolerances of the Imax projector. Its theory appears to have been that an action based on misappropriation of a trade secret must divulge what was misappropriated in reasonably precise terms. Second, it considered whether any of the 80 "attributes" listed in Imax's Fourth Supplemental Responses—minus their precise numerical dimensions and tolerances—met the definition of a trade secret under California law. Third, it found that Imax failed to rebut CTI's evidence that all 80 "attributes" were either generally known to persons in the industry or readily available through public means. The district court on that basis granted CTI summary judgment on Imax's trade secrets claim.

It also granted CTI summary judgment on the unfair competition claim on the basis that Imax's unfair competition claim necessarily depended upon "a threshold finding that [Imax] ha[d] identified at least one legally protectable trade secret." The district court also denied Imax's motion for partial adjudication that 24 of its alleged trade secrets were not in the public domain. Imax timely appeals these rulings.

**3.** To avoid confusion, we follow the parties' lead of using the term "public domain" as a short-handed reference to the trade secret requirement that information not be "generally known to the

## II.

## JURISDICTION AND STANDARD OF REVIEW

The district court's jurisdiction rests on 28 U.S.C. § 1332. Our appellate jurisdiction rests on 28 U.S.C. § 1291.

A grant of summary judgment is reviewed de novo. *See Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the relevant substantive law was correctly applied. *See id.*

## III.

## DISCUSSION

A. *Summary Judgment on Imax's Trade Secrets Claim*

The heart of Imax's appeal is the propriety of the district court's ruling that the failure of Imax to identify the precise numerical "dimensions and tolerances" of its projector, of which its trade secrets consist, defeats the trade secrets claim. Imax's various assignments of error presuppose a ruling that it need not identify the precise numerical "dimensions and tolerances" of its projector in its interrogatory responses.

1. *Did Imax Identify the Numerical Dimensions and Tolerances as Trade Secrets with Sufficient Particularity?*

■ Imax first contends that it identified in its Fourth Supplemental Responses the precise numerical dimensions and tolerances as trade secrets with sufficient particularity. We disagree.

■ A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 522 (9th Cir.1993). The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from mat-

public or to other persons who can obtain economic value from its disclosure." *See* Cal. Civ. Code § 3426.1(d)(1) (West 1997).

ters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Universal Analytics v. MacNeal–Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D.Cal.1989) (citation omitted) (emphasis added), *aff'd*, 914 F.2d 1256 (9th Cir.1990).

California law defines a trade secret as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d) (West 1997).[4]

To understand this issue, some background pertaining to the discovery process is necessary. CTI's Interrogatory Nos. 1 and 2 asked Imax to "identify the *entire content* of each and every trade secret" allegedly misappropriated by CTI. Imax initially answered Interrogatory Nos. 1 and 2 by referring CTI to 469 documents pursuant to Fed.R.Civ.P. 33(d).[5] Thereupon CTI twice moved to compel complete responses to Interrogatory Nos. 1 and 2. On June 12, 1995, Magistrate Judge Infante granted CTI's motion, and ordered Imax to supply "complete, written responses to CTI's Interrogatory Nos. 1 and 2." Imax was further ordered not "[to] employ the option provided by Federal Rule of Civil Procedure 33(d)."

Imax moved for reconsideration, arguing that it had already identified its trade secrets with reasonable particularity and that CTI

was not entitled to a written description of its trade secrets "to the level of 'x feet, y inches.'" Imax pointed out that the deposition of its expert, William Shaw, had provided CTI with a complete identification of all its trade secrets. Imax contended that it should not have to provide written descriptions of trade secrets that had already been the subject of deposition testimony or that were directly reflected in previously produced documents. Imax's motion for reconsideration was denied without comment.

Imax filed Second and Third Supplemental Responses, identifying 138 and 136 trade secrets respectively. Along with its response, Imax interposed the following objections to CTI's Interrogatory Nos. 1 and 2:

Imax objects to this interrogatory on the ground that it is premature in that Imax's discovery and investigation in this action are continuing. Accordingly, Imax does not yet know the identification of each trade secret that has been misappropriated by Johnson ... and Imax reserves its right to supplement or amend its response as more information becomes available from defendants.

Imax further objects to this interrogatory on the ground that, to the extent it calls for the identification of *"the entire content" of Imax's trade secrets, it is vague, ambiguous, overly broad and unduly burdensome.*

(emphasis added).

CTI responded by moving to compel Imax to comply with the magistrate's June 12, 1995 order to compel. On August 16, 1995, Magistrate Judge Infante denied CTI's motion to compel, but additionally overruled Imax's objections and ordered it to comply with Fed. R. Civ. Proc. 26(e)[6] by supple-

---

4. The parties do not dispute that California law applies to Imax's misappropriation of trade secrets and unfair competition claims. *See Consolidated Data Terminals v. Applied Digital Data Sys.*, 708 F.2d 385, 390–91 n. 3 (9th Cir.1983).

5. Fed.R.Civ.P. 33(d) provides in relevant part: "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served ... it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained...."

6. Fed.R.Civ.P. 26(e) imposes a duty on a party to "supplement or correct" their interrogatory responses under certain circumstances, such as when "ordered by the court" or if "the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

menting its interrogatory responses to CTI's Interrogatory Nos. 1 and 2 on or before August 31, 1995.

Pursuant to the magistrate's August 16, 1995 order, Imax filed its Fourth Supplemental Responses—this time identifying 80 trade secrets allegedly misappropriated by CTI. Imax identified its trade secrets, enumerated as items (a)-(cb), in the following manner:

Imax believes that CTI has misappropriated all or part of the following Imax trade secrets embodied in Imax's ... projector system:

\* \* \*

bb. the design of the cam unit, *including every dimension and tolerance that defines or reflects that design;*

\* \* \*

bd. *the manner of operation of the cam unit;*

be. *the manner in which the cam unit is lubricated;*

bf. *the design of the film arms, including every dimension and tolerance that defines or reflects that design;*

\* \* \*

(emphasis added).

At summary judgment, Imax, while conceding that its patents revealed the existence and manner of operation of the projector's various components, nevertheless argued that summary judgment was improper because the patents did not reveal the components' precise dimensions and tolerances. The following exchange occurred:

Imax: We're arguing as a level of specificity and they're arguing a level of generality. They're saying the patent discloses the film arm and we're saying, yes, but not the dimensions and the tolerance. Yes, the patent shows the existence of a film arm, but it doesn't say it's 6.222 millimeters. And we're talking about something that has to be precise within thousandths of an inch.

\* \* \*

Court: So if I read Exhibit U, I can't find out from that what the trade secret is. I have to go someplace else. I have to get something that tells me what the dimension is.[7]

Imax: Well, reading Exhibit U will tell you what the trade secret is. It tells you it's the dimension. If you want more detail about that, you can look at the Velinsky Report, you can look at the Shaw Deposition

. . . .

Court: Exhibit U doesn't give me the trade secret. Exhibit U gives me something that leads me to the trade secret, where I go someplace else.

Imax: If—Exhibit U tells you the trade secret. It does not give you the detail of the trade secret of 6.22. That's an accurate statement.

Court: You have to say 6.22 or it's not a trade secret.

The district court ruled that because Imax did not identify the precise numerical dimensions and tolerances in its Fourth Supplemental Responses, Imax failed to carry its burden of identifying for the court exactly what dimensions and tolerances it claimed as trade secrets. Thus, the issue turns on whether Imax identified the precise numerical dimensions and tolerances of its projector as trade secrets with sufficient particularity.

Imax argues that its level of specificity was approved by this court in *Forro Precision, Inc. v. Intern. Business Machines,* 673 F.2d 1045, 1057 (9th Cir.1982). We disagree. *Forro* involved the misappropriation of engineering drawings and blueprints encompassing the dimensions and tolerances of IBM's "Merlin" and "Winchester" disc devices. IBM put on a wealth of evidence which established that before it had placed the Merlin and Winchester devices on the market, Forro

---

**7.** At summary judgment, Imax's Fourth Supplemental Responses were submitted as "Exhibit U."

wrongfully acquired IBM's trade secret information "in the form of engineering drawings and blueprints." *See id.* This evidence strongly rebutted Forro's assertion that it had not misappropriated any trade secrets but had lawfully reverse engineered material that had been placed on the market.

Although we held that IBM's reference to "dimensions and tolerances" was sufficient to claim trade secrets in engineering drawings and blueprints, to repeat, our holding did not suggest that the incantation of "dimensions and tolerances" was sufficient to identify trade secrets in precise numerical dimensions and tolerances. *See id.* We found IBM's identification of its trade secret sufficient because it clearly referred to trade secret material, i.e., engineering drawings and blueprints.

In Imax's case, however, the catchall phrase "including every dimension and tolerance that defines or reflects that design" does not parallel *Forro* 's degree of specificity because it does not *clearly refer* to tangible trade secret material. Rather, it refers to a patented projector system which *potentially* qualifies for trade secret protection. *See Henry Hope X–Ray Prods., Inc. v. Marron Carrel, Inc.,* 674 F.2d 1336, 1342 (9th Cir.1982) (where patented apparatus contained features that were not disclosed in patent, the undisclosed features qualified for protection as trade secrets).

We further note that because Imax's trade secrets claim involves a sophisticated and highly complex projector system, it is unlikely that the district court or any trier of fact would have expertise in discerning exactly which of the projector system's many "dimensions and tolerances" were trade secrets. Moreover, CTI could not be expected to prepare its rebuttal to Imax's trade secrets claim without some concrete identification of exactly which "dimensions and tolerances" Imax alleged were incorporated into CTI's own projector system.

We therefore hold that Imax's Fourth Supplemental Responses failed to indicate precisely which dimensions and tolerances were

trade secrets. Under these facts, reasonable specificity could only be achieved by identifying the precise numerical dimensions and tolerances as trade secrets. We reject Imax's contention that use of the catchall phrase "including every dimension and tolerance that defines or reflects that design" achieved the level of specificity necessary to identify the numerical dimensions and tolerances as trade secrets. *See Forro Precision, Inc.,* 673 F.2d at 1057; *see also Universal Analytics,* 707 F.Supp. at 1177.

### 2. Did the District Court Misapply Fed. R.Civ.P. 26(e)?

■ ■ Imax contends that the district court misapplied Fed.R.Civ.P. 26(e) by refusing to consider any trade secret material that was not specifically listed *in haec verba* in Imax's Fourth Supplemental Responses. Imax argues that the deposition of its expert, William Shaw, as well as the deposition of CTI's expert, Robert H. Gurr, sufficiently identified the precise numerical dimensions and tolerances as trade secrets. This argument, however, conveniently ignores the fact that both depositions were taken several months *before* Magistrate Judge Infante ordered Imax to supplement complete responses to Interrogatory Nos. 1 and 2. Without regard to whether certain precise numerical dimensions and tolerances were revealed in those depositions, Imax was under court order to identify the *entire content* of its trade secrets through supplemental responses.

We view Imax's argument as an attempt to have this court modify Magistrate Judge Infante's discovery orders. The motion by Imax for reconsideration of the magistrate's order to compel complete responses used the very same arguments made here.[8] We reject these arguments. Imax should have accepted the magistrate's denial of its motion for reconsideration and should have heeded the magistrate's August 16, 1995 order rejecting its contention that Interrogatory Nos. 1 and 2 were "vague, ambiguous, overly broad and unduly burdensome." Any confusion on the part of Imax as to the level of specificity required to "[i]dentify the entire

---

8. Imax moved for reconsideration on the ground that: (1) Imax had already identified its trade secrets with reasonable particularity; (2) CTI was not entitled to a written description of its trade secrets "to the level of 'x feet, y inches' "; (3) the deposition of William Shaw had provided CTI with a complete identification of all Imax's trade secrets.

content of each and every alleged trade secret" should have been resolved by requesting further clarification of the June 1995 and August 1995 discovery orders. By failing to do so, Imax knowingly incurred the risk that its Fourth Supplemental Responses would not meet the "reasonable particularity" requirement. Moreover the parties' stipulated protective order removed the possibility that Imax's resistance was properly based on a fear of surrendering its secrets to CTI.[9] It follows that Imax incurred the risk of violating a proper discovery order.

Although Imax submitted the precise numerical dimensions and tolerances in its Fifth Supplemental Responses, the district court found those responses to be a "violation of the discovery orders of Magistrate Judge Infante." However, because the exclusion of the dimensions and tolerances evidence by the district court did not amount to a dismissal of Imax's trade secrets claim, we need not decide whether Imax's actions were "willful" or "in bad faith." *See United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir.1980) (dismissal of action or preclusion of evidence that is tantamount to dismissal may be imposed only where offending party has acted willfully or in bad faith).

### 3. The District Court Properly Applied Fed.R.Civ.P. 56

Imax argues that the district court failed to consider all of the evidence that it was required to consider under Fed. R. Civ. Proc. 56(c), and failed to draw all reasonable inferences in its favor. For example, Imax argues that the district court improperly ignored the Velinsky Report, the Gurr Report, the Shaw deposition, and the Kerr deposition—all of which allegedly demonstrated that the "dimensions and tolerances of various parts of the Imax projector" were not in the "public domain." We have rejected this contention, however. Therefore, the district court properly excluded such evidence due to Imax's failure to allege trade secrets in the precise numerical dimensions and tolerances with sufficient particularity. *See MAI Sys. Corp.*, 991 F.2d at 522.

### 4. The District Court's Application of California Trade Secret Law

■ Imax next contends that the district court misapplied California trade secret law, embodied in Cal. Civ.Code § 3426.1(d)(1) (West 1997), by concluding that the 80 "attributes" identified in its Fourth Supplemental Responses were all "available through public means."[10] Imax, however, does not argue on appeal that the 80 "attributes" identified in its Fourth Supplemental Responses—minus their dimensions and tolerances—qualify as trade secrets. Rather, the argument presupposes that the precise numerical dimensions and tolerances were sufficiently identified as trade secrets. Because we hold that they were not, we need not address the issue.[11]

9. Prior to discovery, the parties stipulated to a comprehensive protective order so as to preserve the secrecy of their proprietary information. Pursuant to this order, highly sensitive information received the designation "Confidential–Attorneys Eyes Only," limiting its accessibility to certain individuals. Those who had access to confidential information were expressly ordered not to use such information for "any business, proprietary, commercial or competitive purpose." All confidential information was to be filed under seal.

10. The district court ruled that Imax "conveniently overlook[ed] the [Uniform Trade Secret Act] requirement that to qualify as a 'trade secret' the information at issue *must not be* available through public means." We note, however, that whether information is " 'readily ascertainable' is not part of the definition of a trade secret in California." *See ABBA Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 21, 286 Cal.Rptr. 518 (1991). It is available as a defense, however, "based

upon an absence of misappropriation, rather than the absence of a trade secret." Although Johnson stated that CTI had built its projector relying "only on information about projectors ... [known] to be in the public domain," the district court did not endeavor to determine whether CTI actually relied only on the "public domain" sources in creating its own projector. *See id.* at 21–22 n. 9, 286 Cal.Rptr. 518.

11. CTI argues that we may affirm the district court's grant of summary judgment on the alternative ground that Imax failed to satisfy Cal. Civ.Code § 3426.1(d)(2) (West 1997)—that the information was the subject of efforts that were reasonable under the circumstances to maintain its secrecy. The district court, however, did not think it necessary to reach this issue. We find the record insufficiently developed to affirm on this basis. *See Senger v. United States*, 103 F.3d 1437, 1443 (9th Cir.1996). Moreover, because Imax failed to satisfy the first element of the trade secret definition, Cal. Civ.Code

## B. *Summary Judgment on Imax's Unfair Competition Claim*

Imax contends that the district court incorrectly applied California law when it held that Imax's failure to establish a legally protectable trade secret necessarily defeated its unfair competition claim. Imax argues that it is entitled to maintain an unfair competition claim based on common law misappropriation.[12]

▮ Under California law a plaintiff can maintain a common law unfair competition claim regardless of whether it demonstrates a legally protectable trade secret. In *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466–67 (9th Cir.1990) we recognized this principle and held that a plaintiff could state an unfair competition claim based upon the two separate traditional tort causes of action, breach of confidential relationship and common law misappropriation.

The district court disposed of Imax's unfair competition claims in a cursory fashion. First, the district court found that because Imax had failed to rebut CTI's evidence to the effect that it *could have gained* the information from public domain sources, Imax had failed to establish any legally protectable trade secrets. Second, the district court held that because CTI demonstrated that the information was "available through public means," the fact that Johnson and CTI may have actually acquired Imax's information by improper means was of no legal consequence. The district court granted summary judgment on Imax's unfair competition claim without further comment.

▮ To repeat, the unfair competition claim of Imax rests on a fusing of the separate torts of common law misappropriation and breach of confidentiality. Its common law misappropriation claim seeks to hold Johnson and CTI liable for Johnson's allegedly improper actions during his two-week inspection at Great America.[13] At summary judgment, Imax also submitted evidence indicating that each of its customers is bound by a confidentiality agreement. Imax, in support of its unfair competition claim, argued that its evidence raised genuine issues of material fact as to "whether [d]efendants knew or should have known that they acquired Imax's trade secrets by improper means, including through misrepresentation and inducement of a breach of a duty to maintain secrecy." Imax pointed out that Johnson admitted that shortly after leaving NJ Engineering, he learned that the confidentiality restriction in the Imax lease agreements covered projectors even beyond the term of the lease.[14]

Imax also insists that even after Johnson and CTI became aware of the confidentiality restrictions, they nevertheless used information acquired at Great America in order to create the CTI projector. In support, Imax submitted the Velinsky Report wherein Imax's expert witness outlined significant similarities between the two projectors. That report also states that the design, development and production of a rolling loop projector required a significant investment of time and that the time it took Johnson to develop the CTI projector—ten months— "strongly supports the conclusion that Johnson and CTI used Imax's trade secrets in designing the CTI projector." We hold that Imax submitted substantial evidence indicating that Johnson and CTI did not create the CTI projector by "fair and honest means such as by independent invention, accidental disclosure or by so-called reverse engineering." *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir.1982) (citation omitted).

§ 3426.1(d)(1), we need not decide whether it additionally failed to meet subsection (2).

**12.** Imax does not appeal the district court's grant of summary judgment for CTI on its statutory unfair competition claim pursuant to Cal. Bus. & Prof.Code § 17200 (West 1997).

**13.** California's common law misappropriation has three elements: "(1) the plaintiff has invested substantial time and money in development of its ... 'property'; (2) the defendant has appropriated the [property] at little or no cost; and (3) the plaintiff has been injured by the defendant's conduct." *See Balboa Ins. Co. v. Trans Global Equities*, 218 Cal.App.3d 1327, 1342, 267 Cal. Rptr. 787 (1990).

**14.** Johnson stated at his deposition that he "felt set up" because Mariani had told him that "it was okay to go disassemble the Imax projector at Santa Clara because it was out of lease."

 CTI attempts to minimize this evidence of its improper conduct by arguing that *"every* access by Johnson was properly authorized" by Imax's customers. We reject this contention.[15] In doing so we express our agreement with a California court that held that a competitor becomes a party to a breach of confidential relationship where the competitor accepts information from one who is under a duty not to disclose it and the information is received either with actual knowledge of such facts or under circumstances giving rise to a duty to inquire further. *See Ralph Andrews Productions, Inc. v. Paramount Pictures Corp.,* 222 Cal.App.3d 676, 682–83, 271 Cal.Rptr. 797 (Cal.Ct.App. 1990). Imax rests its unfair competition claim in part on the contention that both Johnson and CTI were a party to the breach of trust arising out of Great America's senior manager's breach of the confidentiality agreement with Imax. *See Chicago Lock Co.,* 676 F.2d at 405 (party liable if they intentionally procured one under a duty of confidentiality to disclose secret in breach of that duty).[16]

Construing the relevant evidence in the light most favorable to Imax, we hold that genuine issues of fact remain as to whether Johnson had constructive knowledge that Great America's senior manager did not have the right to permit unlimited access to the Imax projector—much less the photographing, measuring, and taking apart of the Imax

projector. At the very least, Imax raised "facts which a jury could determine would have made a reasonable person suspicious." *See Ralph Andrews Productions, Inc.,* 222 Cal.App.3d at 684, 271 Cal.Rptr. 797. Although Johnson's declaration asserted that none of the information he obtained at Great America was used in the construction of the CTI projector, we believe Imax submitted significant evidence from which a jury could find that he had. Accordingly, we reverse the district court's grant of summary judgment for CTI on Imax's unfair competition claim and remand for further proceedings.[17]

## IV.

### CONCLUSION

We AFFIRM the district court's judgment granting Johnson and CTI summary judgment on Imax's misappropriation of trade secrets claim. We VACATE the district court's judgment granting Johnson and CTI summary judgment on Imax's unfair competition claim and REMAND for further proceedings consistent with this opinion. AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART AND REMANDED. Each party shall bear its own costs.

15. Imax submitted portions of Johnson's deposition wherein Johnson stated that Mariani had arranged for Johnson and a team from NJ Engineering to inspect the projector at Great America by telling Great America's senior manager that they would be testing a video laser. According to Johnson's deposition and sworn declaration, Great America's senior manager granted Johnson and NJ Engineering employees unrestricted access to the Imax projector. Johnson further stated that prior to the inspection, Mariani and Great America's senior manager had entered into preliminary discussions about replacing the Imax projector at Great America with a projector manufactured by NJ Engineering. In his declaration, Johnson averred that Mariani instructed him to tell Greg Carrolan, Great America's theater manager, and other low-level employees "only that [they] were testing a laser projection system" in order to "prevent Imax from learning of the real purpose of the visit." However, no laser was ever tested. Johnson stated at his deposition that when he expressed concern about these measures to Mariani, he was told by Mariani not to

worry because the projector was "out of lease." Johnson further stated at his deposition that at the time of the inspection, he believed his inspection was "okay" because the projector was "out of lease" and because Great America's senior manager had granted unlimited access to the projector.

16. We reject CTI's argument that Imax's unfair competition claim seeks patent-like protection and therefore is preempted by federal patent law. Because Imax's unfair competition claim involves a breach of confidentiality and the employment of improper means to procure proprietary information, preemption does not apply. *See Summit Mach. Tool Mfg. v. Victor CNC Systems,* 7 F.3d 1434, 1440–41 (9th Cir.1993).

17. We do not address the district court's denial of Imax's countermotion for summary adjudication. *See Simons v. United States,* 497 F.2d 1046, 1050 (9th Cir.1974) (holding that the denial of summary judgment is non-appealable).