**CALLAWAY GOLF COMPANY,**
Plaintiff/Defendant–in–Counterclaim,

v.

**DUNLOP SLAZENGER GROUP AMERICAS, INC., d/b/a MAXFLI,** Defendant/Plaintiff–in–Counterclaim.

No. CIV.A. 01–669–KAJ.

United States District Court, D. Delaware.

May 13, 2004.

Jack B. Blumenfeld, Esq., Morris Nichols Arsht & Tunnell, Wilmington, DE, for Plaintiff. Of Counsel: Robert E. Cooper, Esq., Gibson Dunn & Crutcher, Los Angeles, CA, Jeffrey T. Thomas, Esq., Gibson Dunn & Crutcher, Irvine, CA.

Rick S. Miller, Esq., Ferry, Joseph & Pearce, P.A., Wilmington, DE, for Defendant. Of Counsel: John P. Kelly, Esq., Lorusso Loud & Kelly, LLP, Fort Lauderdale, FL, Richard M. Husband, Esq., Mark D. Lorusso, Esq., Lorusso Loud & Kelly, LLP, Portsmouth, NH, David P. Tulchin, Esq., Robin D. Fessel, Esq., Sullivan & Cromwell, LLP, New York City.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

Presently before me is a motion by Callaway Golf Company ("Callaway") for

partial summary judgment on the misappropriation of trade secrets counterclaim[1] asserted by Dunlop Slazenger Group Americas, Inc. d/b/a Maxfli ("Dunlop"). (Docket Item ["D.I."] 310; the "Motion"). Specifically, Callaway seeks summary judgment on Dunlop's allegation that a former Dunlop polyurethane chemist, Pijush Dewanjee ("Dewanjee"), who went to work for Callaway, misappropriated Dunlop's polyurethane golf ball technology to develop golf balls for Callaway.[2] I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. For the reasons that follow, the Motion will be granted.

## II. Background[3]

Dunlop has been in the business of manufacturing golf balls for approximately one hundred years. (D.I. 338 at 3.) According to Dunlop, three-piece, cast polyurethane-covered golf balls have replaced balata covered golf balls as the premium variety of golf ball. (*Id.* at 4.) Dunlop asserts that it began to develop three-piece, cast polyurethane-covered golf balls in 1996, and became only the second manufacturer of

such balls with its introduction of the REVOLUTION and HT golf balls in the fall of 1997. (*Id.*)[4] Dunlop alleges that Callaway, a manufacturer of golf clubs, decided in the mid–90's to enter the golf ball business. (*Id.*) Dunlop further alleges that in 1997 Callaway began hiring employees with experience in polyurethane golf ball technology, including Dewanjee, to develop Callaway's new golf ball. (*Id.* at 5.)

Dewanjee was an employee of Dunlop from on or about April 8, 1996 to on or about June 6, 1997. (D.I. 293 at ¶ 9.) During the course of his employment with Dunlop, Dewanjee worked on developing a three-piece polyurethane covered golf ball, and he was the "inventor and formulator for Dunlop's cast polyurethane golf cover system." (D.I. 338 at 6.) Dewanjee's work resulted in an invention disclosure, which Dewanjee filed with Dunlop's research and development department on December 5, 1996, describing a "golf ball having a core, a boundary layer made of Surlyn polymer, and a cover made of polyurethane." (D.I. 293 at ¶ 12). Dunlop claims that this in-

---

1. This case originally began as a patent infringement case brought by Callaway (D.I.1), and Dunlop brought various counterclaims, including counterclaims for "Declaratory Judgment of Non–Infringement, Invalidity and Unenforceability" of Callaway's U.S. Patent No. 6,213,898 (the "'898 patent") and "Declaratory Judgment of Unenforceability of [the] '898 Patent Due to Inequitable Conduct Before the United States Patent and Trademark Office." (D.I.236.) Callaway and Dunlop agreed to dismiss the patent claims and counterclaims (D.I.287). Dunlop's remaining counterclaims are captioned as claims for misappropriation of trade secrets, negligent hiring, training, supervision and/or retention of employees, patent title, conversion, unjust enrichment, and false advertising under the Lanham Act. (D.I.293.)

2. The misappropriation of trade secrets counterclaim contains two parts. The first is for misappropriation by Pijush Dewanjee ("De-

wanjee") of trade secrets related to polyurethane golf ball covers. The second is for misappropriation of trade secrets found in a set of documents that Henry Felipe ("Felipe") allegedly took with him to Callaway, including Dunlop's "Golf Ball Specifications and Process Manual," after he was "laid off" at Dunlop. (D.I. 293 at ¶¶ 26, 39–49; D.I. 338 at 17–18.) Callaway's Motion does not address Dunlop's misappropriation of trade secrets allegations concerning the Felipe documents.

3. The following rendition of the background information for my decision is cast in the light most favorable to the nonmoving party, Dunlop, and does not constitute findings of fact.

4. Dunlop claims that the Acushnet Company ("Titleist") was the first to produce a three-piece, cast polyurethane-covered golf ball with its introduction of the TITLEIST PROFESSIONAL in 1993. (D.I. 338 at 4.)

vention disclosure has been maintained as a trade secret of Dunlop's ever since that date. (*Id.*) Dewanjee's work also resulted in a February 1997 patent application that "discloses and claims a cast polyurethane-covered golf ball, focusing on a cover system, and names Dewanjee as a co-inventor." (D.I. 338 at 6; *see also* D.I. 342 at Ex. 13.)

At the foundation of its trade secrets misappropriation claim is Dunlop's assertion that Dewanjee had access to information concerning the "use of polyurethane materials for manufacturing polyurethane-covered golf balls," information that Dunlop alleges was confidential and proprietary and constituted protected trade secrets. (*Id.* at ¶ 10.) Specifically, Dunlop asserts that part of Dewanjee's work involved experimenting with the use of the aromatic diamines Ethacure–300 ("E–300") and Ethacure–100 ("E–100") as curatives and curative blends in a golf ball cover.[5] (D.I. 338 at 6.) Dunlop claims that the use of a blend of E–300 and E–100, and the use of a blend of either E–300 or E–100 with a polyol, such as PTMEG, were "novel" at the time of Dewanjee's employment at Dunlop and that "[a]ll of these blends, disclosed in Dewanjee's notes, have desirability for manufacturing because they allow for control of the curing rate of polyurethanes in fewer processing steps, thus eliminating the need for a catalyst (in most situations)." (D.I. 338 at 6–7.)

Dunlop also alleges that Dewanjee worked and/or experimented with TDI and PPDI while employed by Dunlop. (*Id.* at 9.) According to Dunlop, Dewanjee worked with Uniroyal Chemical Company ("Uniroyal"), a Dunlop vendor, to develop a Uniroyal-recommended formulation "for a castable polyurethane cover," and Uniroyal recommended that Dewanjee use TDI as a prepolymer. (*Id.* at 8–9). Dunlop filed a patent application in February, 1997, and Dunlop states that the February 1997 patent application "relates to a cover system based on a . . . TDI prepolymer cured with a blend of E–300 and E–100." (*Id.* at 9.)

Dunlop asserts that Uniroyal told Dewanjee that "PPDI would be superior to the other diisocyanates in terms of performance and would be particularly suitable for use in polyurethane-covered golf balls," "sent Dewanjee a telefax on January 12, 1997 containing information regarding the advantages of PPDI," and "provided Dewanjee with a sample of PPDI prepolymer 'to evaluate as a golf ball cover.'" (*Id.; see also* D.I. 293 at ¶ 23.) Dunlop also claims that Dewanjee discouraged the inclusion of a disclosure regarding PPDI in Dunlop's February 1997 patent application. (D.I. 338 at 10.) Dunlop states that Dewanjee signed a confidentiality agreement at Dunlop that "information relating to Dunlop's polyurethane golf ball technology, and information obtained from Dunlop vendors used to design or develop products" was Dunlop's confidential and proprietary information. (*Id.* at 10; *see also* D.I. 293 at ¶ 11.)

On or about June 6, 1997, Dewanjee voluntarily terminated his employment at Dunlop. (D.I. 293 at ¶¶ 14–15; D.I. 311 at 6.) On June 9, 1997, Dewanjee became an employee of Callaway. (*Id.*) Dunlop alleges that Dewanjee had been in contact with Callaway about employment at least as early as April, 1997. (*Id.* at 11.) Dunlop

---

**5.** According to Callaway, in order to make a polyurethane golf ball cover, a prepolymer and a curative are needed. A prepolymer consists partly of an ingredient called a diisocyanate. The three diisocyanates used in the golf ball industry are best known by their acronyms, PPDI, MDI, and TDI. A formula may contain a single prepolymer or a blend of two or more prepolymers. The two most common types of curatives are amines and diols. A formula may contain a single curative or a blend of two or more curatives. (D.I. 311 at 2.)

claims that Dewanjee was hired to use his polymer experience and background to make a golf ball, and that Callaway "did not know anything" about the design or characteristics of the ball when Dewanjee commenced his employment with Callaway, and did not even have any laboratory equipment until months after his arrival. (*Id.*) On June 12, 1997, three days after commencing his employment with Callaway, Dewanjee telefaxed Uniroyal the claims of Dunlop's February 1997 patent application regarding three-piece, cast polyurethane-covered golf balls. (*Id.; see also* D.I. 342 at Ex. 13.) On the telefax, "PPDI" was hand-written next to "diisocyanate" in claim two of the application, "E–300" was hand-written next to the term "curing agent" in claim six, and "E–300 E–100" was hand-written next to the term "curing agent" in claim seven. (*Id.*)

Dewanjee's Callaway laboratory notes, taken during the summer of 1997, discuss polyurethane golf ball systems involving PPDI blends, refer to the curatives E–300, and the use of an E–300/E–100 blend. (D.I. 342 at Ex. 14.) Dunlop claims that because Dewanjee did not perform any "wet laboratory work"[6] during that time, Callaway did not have any laboratory equipment, and Dewanjee "had no golf ball experience whatsoever prior to Dunlop," "the notes could only refer to information he had obtained from his work at Dunlop." (D.I. 338 at 12.)

On or about April 20, 1999, Dewanjee filed a patent application and United States Patent No. 6, 117,024 (the " '024 patent") was issued to Dewanjee on September 20, 2000. (*Id.* at ¶ 21.) Dewanjee assigned the '024 patent to Callaway. (*Id.*) According to Dunlop, the '024 patent claims "as an invention" a golf ball comprising a core, a boundary layer, and a cover "formed from reactants comprising [PPDI] and a mixture of diols." (*Id.* at ¶¶ 23–24.) Dunlop claims that technology disclosed in the '024 patent constituted Dunlop's protected trade secrets. (*Id.* at ¶ 24.)

On or about February 2000, Callaway introduced a three piece golf ball with a cast polyurethane-cover, which it promotes and sells as the "Rule 35 Firmfeel" and "Rule 35 Softfeel" (the "Rule 35 golf balls") and the "CTU 30 Red" and "CTU 30 Blue" (the "CTU golf balls"). (*Id.* at ¶ 16.) Dunlop alleges that "the physical characteristics of the Rule 35 golf balls and the CTU 30 golf balls, particularly the core, Suryln polymer boundary layer, and polyurethane cover, are the same as the characteristics of the golf ball disclosed in the Dewanjee invention disclosure" filed with Dunlop on December 5, 1996, *supra.* (*Id.* at ¶ 20.) Dunlop claims that, "more recently," Callaway has been promoting and selling the "CB1 Red" and "CB1 Blue" golf balls (the "CB1 golf balls"), which "is the same as a core formulation previously developed by Dunlop which constituted confidential and proprietary information of Dunlop and protected trade secrets." (*Id.* at ¶ 25.)

Dunlop brings its misappropriation of trade secrets claims under the California Trade Secrets Act, Cal. Civ.Code §§ 3426.1 *et seq.* ("CUTSA").[7] Dunlop seeks injunctive relief, a constructive trust on Callaway's profits with respect to the misappropriated technology, damages, attorney's fees, and costs. (*Id.* at ¶¶ 39–49.)

### III. Standard of Review

█ Rule 56 of the Federal Rules of Civil Procedure provides that summary

---

6. By use of this phrase, Dunlop apparently means that Dewanjee did not conduct laboratory experiments.

7. Both Dunlop and Callaway agree that California law applies to Dunlop's misappropriation of trade secrets counterclaim.

judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id.* at 255, 106 S.Ct. 2505; *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

## IV. Discussion

Based on Dunlop's allegations, as set forth in the background section above, a reasonable fact finder could conclude that Dewanjee took some information with him when he left Dunlop. However, the issue before me is whether Callaway, through Dewanjee, misappropriated trade secrets from Dunlop. To establish a misappropriation of trade secrets claim under CUTSA, the plaintiff has the burden of showing "that [the] defendant has been unjustly enriched by the improper appropriation, use or disclosure of a 'trade secret.'" *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521–22 (9th Cir. 1993). CUTSA defines a "trade secret" as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d). Under CUTSA, the "plaintiff should 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir.1998) (quoting *Universal Analytics v. MacNeal–Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D.Cal.1989)).

While it is not clear from the Counterclaim (D.I.293) what trade secrets or proprietary information were allegedly misappropriated by Dewanjee for Callaway, Dunlop states in its Answering Brief that "the trade secret is really ... [t]he polyurethane cover technology, including PPDI-based technology, that Callaway used to develop its golf ball as a whole." (D.I. 338 at 28.) Dunlop asserts that this polyurethane cover technology is:

embodied in Dunlop's February, 1997 Patent Application, Dewanjee's Dunlop laboratory notebooks, the information Dewanjee obtained and/or developed while at Dunlop concerning its polyurethane cover technology and the potential uses of PPDI in a polyurethane cover system, including the information concerning PPDI that Dewanjee obtained from [Uniroyal], and encompasses a golf ball cover system comprising any of the diisocyanate embodiments or blends of diisocyanate embodiments that were or

should have been disclosed and covered under the February, 1997 Patent Application, including PPDI, cured with any of the curing agents or curative blends disclosed in Dewanjee's Dunlop laboratory notes and/or the February, 1997 Patent Application.

(*Id.*) Dunlop also alleges that its three-piece, polyurethane-covered golf ball technology is a trade secret embodied in the "December 5, 1996 Invention Disclosure, Dewanjee's Dunlop laboratory notebooks and the information Dewanjee obtained and/or developed while at Dunlop with respect to the [a the three-piece, polyurethane-covered golf ball]." (*Id.* at 23.)

The first question before me is whether a reasonable fact finder could find that Dunlop's allegations constitute trade secrets. Next is whether Dunlop's misappropriation claims are sufficient to withstand the Motion.

## A. Dunlop's trade secret claim involving PPDI

■ At least as to Dunlop's allegations involving PPDI, the evidence compels the conclusion that the information at issue is not a trade secret and, therefore, Dunlop has no claim for misappropriation of a trade secret. The idea of using a PPDI prepolymer in a golf ball cover was previously disclosed in issued patents.[8] Moreover, the information that Dewanjee received from Uniroyal regarding the potential uses of PPDI in a polyurethane cover system, namely the PPDI polymer sample that Uniroyal provided to Dunlop and the January 22, 1997 telefax from Uniroyal to Dewanjee regarding the advantages of a PPDI prepolymer, was not Dunlop's trade secret because, in the confidentiality agreement entered into by Dunlop and Uniroyal, Dunlop "acknowl-

edges that the Information disclosed by [Uniroyal] to [Dunlop] is proprietary to [Uniroyal] and is solely the property of [Uniroyal]." (D.I. 342 at Ex. 10.) Thus, the information Dewanjee received concerning the potential uses of PPDI in a golf ball cover originated with Uniroyal, and, as a matter of law, that information cannot be a Dunlop trade secret. *See Bowser, Inc. v. Filters, Inc.,* 398 F.2d 7, 10 (9th Cir.1968) ("[T]he California precedents clearly demonstrate that the ideas, formulae, designs, knowledge or skill asserted a constituting plaintiffs' trade secrets must have originated with the plaintiffs").

■ Finally, Dunlop has not carried its burden of proof that PPDI combined with the processes and formulas set forth in the February 1997 patent application, Dewanjee's Dunlop notebooks, and Dewanjee's monthly progress reports are its trade secrets. (D.I. 338 at 9). *See Imax Corp.,* 152 F.3d at 1164 ("A plaintiff seeking relief for misappropriation of trade secrets must ... carry the burden of showing that they exist"). For example, Dunlop claims that Dewanjee did not mention PPDI in the February 1997 patent application because he was "obviously saving the idea for his work at Callaway as he started working with Uniroyal on such a system only days after leaving Dunlop." (D.I. 338 at 17.) Dunlop also claims that Dewanjee "generated copious notes in his Callaway laboratory notebook during the summer of 1997 detailing polyurethane golf ball systems involving PPDI blends ... while he had produced only 24 pages in his laboratory notebook during his fourteen months at Dunlop—with no entries after December 10, 1996." (*Id.* at 12.) Dunlop further claims that Dewanjee's notebook is "devoid of any entries corresponding to the prog-

8. There are at least two patents that issued before either Dunlop or Callaway began polyurethane research that disclose the idea of

using a PPDI preopolymer in a golf ball cover. (D.I. 315 at Ex.'s H & I.)

ress report," which "include numerous entries concerning prepolymer blending and working with PPDI,"[9] and thus creates "an inference ... that Dewanjee was secreting the results of his work." (*Id.* at 17.)

While these claims suggest, at most, that Dewanjee learned something about PPDI while working at Dunlop, Callaway claims and Dunlop does not dispute, that nobody at Dunlop ever worked with PPDI.[10] (D.I. 315 at Ex. F; D.I. 325 at ¶¶ 17, 26; D.I. 324 at ¶¶ 10, 13.) In *Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*, 80 F.Supp.2d 25, 31–32 (N.D.N.Y.1999), the court held that the plaintiff failed to present "sufficient evidence to establish the existence of a trade secret," in part because the defendant established that it, and not the plaintiff conducted the necessary experimentation and testing to generate an improved formula for a product by using ingredients similar to, but different from those used in plaintiff's initial formulation. Because Dunlop has failed to put forth any evidence that it experimented with PPDI in connection with the formulas set forth in the February 1997 patent application and Dewanjee's notebooks and progress reports (D.I. 338 at 17–20), and Callaway has submitted evidence that it arrived at its final golf ball cover formulations independently (D.I. 311 at 19–22), I hold that Dunlop, has not established the existence of a trade secret. Accordingly, the Motion will be granted as to Dunlop's claims involving PPDI.

### B. Dunlop's trade secrets claim involving the February 1997 patent application and Dewanjee's laboratory notebooks

As previously discussed, Dunlop filed a patent application in February, 1997 that "discloses and claims a cast polyurethane-covered golf ball, focusing on a cover system." (D.I. 338 at 6; *see also* D.I. 342 at Ex. 13.) The crux of the February 1997 patent application is a combination of fast and slow-reacting diamine curatives, which, according to Dunlop, covers a "TDI prepolymer cured with a blend of E–300 and E–100 curity." (D.I. 338 at 17; *see also* D.I. 353 at Ex. B.) Dunlop claims that this combination is its trade secret. (D.I. 338 at 28.) Dunlop also claims that its polyurethane golf ball technology, which is embodied in Dewanjee's Dunlop laboratory notebooks is its protected trade secrets. (*Id.*) Dewanjee's laboratory notebooks disclose the use of a blend of E–300 and E–100, the use of a blend of E–300 or E–100 with a polyol, such as PTMEG, "a blend of diamines and polyols as a curative, in any combination, such as a blend of E–300, E–100 and a PTMEG," and "a combination of TDI prepolymer ... cured with a blend of diamine, E–300 and a polyol, PTMEG." (*Id.* at 6–7.)

Dunlop argues that this curing and blending process is a protected Dunlop trade secret because, even if the use of TDI and E–300 in a golf ball is in the public domain, as Callaway asserts,[11]

---

9. As previously mentioned, the blending in Dewanjee's progress reports refers to blends of TDI prepolymers. (D.I. 334 at ¶¶ 9, 14–15.)

10. Dunlop asserts that Dewanjee's monthly progress reports "include numerous entries concerning prepolymer blending and working with PPDI." (D.I. 338 at 29–30.) However, the blending in Dewanjee's notes refers to TDI, and the PPDI material that Dunlop re-

fers to is a commercially available product known as Hylene. (D.I. 334 at ¶¶ 5–29 and Ex.'s E, F, and G.)

11. Callaway argues that the idea of using TDI and E–300 in a golf ball is not a protected Dunlop trade secret because ideas and formulas disclosed in the public domain cannot be trade secrets, and U.S. Patent No. 5,334,673 (the " '673 patent") issued to Titleist on August 2, 1994 discloses that "there are two

"trade secret misappropriation can also be based on a combination of otherwise public domain information." (D.I. 338 at 32.) Dunlop states that it is a "general principle that a trade secret can exist in a combination of characteristics and components, each of which by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." (*Id.*) (*citing Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965)). *See also Crane Helicopter Servs. Inc. v. United States*, 56 Fed. Cl. 313, 324 (Fed.Cl.2003) ("[e]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret").

Callaway asserts that Dunlop's blending and curing processes are not unique because Titleist taught "the blending of two curatives from the diol, triol, diamine and/or triamine groups," in United States Patent No. 3,989,568, which was issued to Titleist on November 2, 1976. (D.I. 351 at 14–15.) However, Dunlop has presented evidence, by way of an expert, that could lead a reasonable fact finder to conclude that the formulas described in the February 1997 patent application and Dewanjee's notebooks were unique or novel.

(D.I. 332 at ¶ 5; *see also* D.I. 338 at 6–7.) [12] Therefore, whether the formulas contained in the February 1997 patent application and Dewanjee's laboratory notebooks constitute Dunlop's protected trade secrets is an open question. But, as it turns out, not one that prevents granting the Motion, because even if the formulas contained in the February 1997 patent application and the notebooks were Dunlop's trade secrets, there is insufficient evidence for a rational fact finder to conclude that Callaway misappropriated them.

■ CUTSA defines misappropriation as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Use improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

categories of polyurethane on the market [including] TDI ... [and that] [s]uitable curatives for use in the present invention are ... [E–300]." (D.I. 311 at 19; D.I. 315 at Ex. J.) The '673 patent also discloses that "[s]uitable polyurethane prepolymers for use in the present invention are made from a polyol, such as a polyether ... and a diisocyanate ... Suitable polyether polyols include [PTMEG]." (D.I. 315 at Ex. J.) Moreover, PTMEG is "an ingredient contained in the off-the-shelf prepolymers ... that golf ball companies buy from suppliers such as [Uniroyal]." (D.I. 351 at 11.)

In *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F.Supp. 1353 (C.D.Cal.1995),

the court stated that "[i]t is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished." *Id.* at 1359. It is undisputed that Callaway did not use E–100 in its golf balls. (D.I. 351 at 16–17.)

12. By sworn affidavit, John Calabria has declared that use of various blends such as E–300 and E–100, E–300 or E–100 with PTMEG, and E–300 with TDI and PTMEG "were not practiced or publicly disclosed" in 1996–1997. (D.I. 332 at ¶ 5.)

(ii) Acquired under circumstances giving rise to a duty to maintain its secret or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or by mistake.

Cal. Civ.Code. § 3426.1(b). To state a claim for misappropriation of a trade secret, there must be disclosure or use of plaintiff's trade secret by the defendant. *See PMC, Inc. v. Kadisha*, 78 Cal.App.4th 1368, 1383, 93 Cal.Rptr.2d 663 (2000) ("Under the plain terms of [CUTSA], defendants may be personally liable [for misappropriation] if: they used . . . [plaintiff's] trade secrets; at the time of the use of the confidential information they knew or had reason to know that knowledge of the trade secrets was derived from or through a person who had improperly acquired the knowledge, or the secrets were obtained by a person who owed a duty to plaintiffs to maintain the secrecy"); *GlobeSpan, Inc. v. O'Neill*, 151 F.Supp.2d 1229, 1235 (C.D.Cal.2001) ("To find misappropriation, California Courts require that the trade secret be used by the Defendant or disclosed by the Defendant to a third party"); *Angres v. Dioptics Med. Prods., Inc.*, No. 84–9203, 1986 WL 83433 (C.D.Cal. Nov. 25, 1986) ("To be entitled to damages for the wrongful appropriation of his trade secret, a plaintiff must prove that the defendant has used plaintiff's secret to the plaintiff's detriment"). Callaway asserts, and Dunlop agrees, at least implicitly, that use of a trade secret is at issue in the trade secret misappropriation claim in this case. (*See* D.I. 338 at 32–33) (arguing that the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is substantially derived from the other's secret).

■ In order to prove that a defendant's use of a trade secret or confidential material constitutes misappropriation, the Ninth Circuit has stated that a plaintiff must show "that defendant's product bears a substantial identity with [its] secrets." *Integral Sys., Inc. v. Peoplesoft Techs. Inc.*, No. C–902598–DLJ, 1991 WL 498874 at *13 (N.D.Cal. July 19, 1991) (citation omitted). *See also Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792 (9th Cir.1976) (the plaintiff must prove "disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant"); *American Can Co. v. Mansukhani*, 742 F.2d 314, 328–29 (7th Cir.1984) ("A party may not use another's trade secret, even with independent improvements, so long as the product or process is substantially derived from the trade secret"). If the plaintiff meets this burden, the burden shifts to the defendant "to prove, if it can, that it arrived at the process by independent invention." *Droeger*, 541 F.2d at 793.

■ Dunlop claims that Callaway's '024 patent is "closely similar" and "substantially derives" from its proprietary process of curing TDI with an E–300/E–100 blend because the '024 patent "includes references to diamines, hydroquinones, oligomeric diamines, and specifically, E–300 and E–100." (D.I. 338 at 31.) Dunlop also argues that the '024 patent is substantially similar to its trade secrets because the '024 patent reveals a "curing agent made from a blend of diamines, . . . which are specifically disclosed to include E–300 and E–100, [and] a catalyst free system." (*Id.*) The facts, however, do not support those assertions.

First, the evidence is overwhelming that the ingredients listed in the '024 patent,

specifically E–300 and TDI, are well known in the public domain. (*See* D.I. 338 at 32–33) (Plaintiff implicitly acknowledging public character of information by arguing that trade secret misappropriation can "be based on a combination of otherwise public information"). Second, the blending of diamine curatives such as E–100 and E–300 and the catalyst free system is listed only as background information in the '024 patent (D.I. 325 at Ex. C), while the actual claims of the '024 patent describe a PPDI prepolymer cured with a mixture of diol curatives (*id.*), thus reinforcing Callaway's assertion that the background information is material already in the public domain. Third, and in further support of the foregoing assertion, the blending of diamine curatives is disclosed in at least one patent that issued prior to the '024 patent. (*See supra* at 13.) Therefore, because the ingredients listed in the background of the patent are commonly known in the industry, and because the concept of blending and curing is generally known in the industry, and because the '024 patent describes a different process than Dunlop's patent application, and because Dunlop has met Callaway's evidence on these points only with conclusory assertions, not evidence, no reasonable fact finder could conclude that the '024 patent bears a "substantial identity" to the formulas and processes embodied in the February 1997 patent application or Dewanjee's Dunlop laboratory notebooks.

Moreover, Dunlop has failed to demonstrate that the RULE 35 golf ball or its progeny were substantially derived from the formulas and processes described in the patent application and Dewanjee's notebooks. (D.I. 338 at 17.) It is undisputed that the ingredients used by Callaway in its polyurethane cover formulations include a blend of a TDI prepolymer and a PPDI prepolymer, a blend of two different PPDI prepolymers, a prepolymer made with Capraalactone, 1,4 butanediol, a TMP cura-

tive, and a TEDA catalyst. (D.I. 351 at 16.) It is also undisputed that the only common ingredients of Dunlop's and Callaway's polyurethane golf ball covers are TDI and E–300, and that Callaway did not use either E–100 or PTMEG. (*Id.; see also* D.I. 338 at 17.) Significantly, Callaway used a catalyst, and the purpose of the blends Dunlop claims as a trade secret was to eliminate the need for a catalyst. (*See* D.I. 351 at 16; D.I. 338 at 6–7.)

Dunlop argues that even if the "ultimate formulas used in Callaway's commercial golf ball products may not contain the specific formulations of Dunlop's proprietary information, ... Dewanjee used the Dunlop formulations to arrive at Callaway's final formulas." (D.I. 338 at 18.) However, the test for determining use is, as Dunlop has accurately explained, whether Callway's technologies are "substantially similar" to Dunlop's. (D.I. 338 at 33) (citing *Integral Systems*, 1991 WL 498874 at *13). Because the ingredients used in the Dunlop and Callaway formulas are not substantially similar, for the reasons just explained, no reasonable fact finder could find that Callaway's polyurethane golf balls were substantially derived from the formulas and processes described in the patent application and Dewanjee's Dunlop notebooks. Accordingly, the Motion will be granted as to Dunlop's claims that Callaway misappropriated trade secrets contained in the February 1997 patent application and Dewanjee's Dunlop laboratory notebooks.

## C. Dunlop's three-piece polyurethane covered golf ball technology claim

Finally, Dunlop claims that Callaway misappropriated its three-piece polyurethane covered golf ball technology, including that embodied in the December 5, 1996 Invention disclosure, Dewanjee's Dunlop laboratory notebooks, or other information

he obtained or developed at while employed by Dunlop was its trade secret. (D.I. 338 at 23.) However, other than conclusory allegations, Dunlop has not presented any evidence in support of its allegation that a three-piece golf ball with a polyurethane cover was its trade secret. *See MAI Sys.*, 991 F.2d 511, 522 (9th Cir.1993) (a party "who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist"). Therefore, the Motion will be granted with respect to this claim.

## V. Conclusion

For the reasons set forth above, the Motion (D.I.310) will be granted. An appropriate order will issue.

### *MEMORANDUM ORDER*

For the reasons set forth in the Memorandum Opinion issued in this case today,

IT IS HEREBY ORDERED that Callaway's motion for partial summary judgment on Dunlop's misappropriation of trade secrets counterclaim (D.I.310) is GRANTED.