For the foregoing reasons, the judgment of the Bankruptcy Appellate Panel is AFFIRMED.

**BOURNS, INC., a California Corporation, Plaintiff–counter–defendant–Appellee,**

v.

**RAYCHEM CORPORATION, a Delaware Corporation, Defendant–counter–claimant–Appellant,**

**Steven D. Hogge, dba New Market Consultants, Counter–defendant–Appellee.**

**Bourns, Inc., a California Corporation, Plaintiff–counter–defendant–Appellant,**

**Thermacon, Inc., Counter–claimant–Appellee,**

v.

**Raychem Corporation, a Delaware Corporation, Defendant–counter–claimant–Appellee.**

**Bourns, Inc., a California Corporation, Plaintiff-counter-defendant,**

and

**Thermacon, Inc., Counter–claimant–Appellee,**

v.

**Raychem Corporation, a Delaware Corporation, Defendant–counter–claimant–Appellee,**

**Steven D. Hogge, dba New Market Consultants; Polymeric Protection Technologies, Inc., Counter–defendants–Appellants.**

Nos. 01–56245, 01–56246, 01–56252.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed June 5, 2003.

Charles C. Lifland, Esq., Los Angeles, CA, for plaintiff Bourns, Inc.

Peter A. Wald, Esq., Latham & Watkins, LLP, San Francisco, CA, for defendant Raychem Corporation.

Allan Gabriel, Esq., Los Angeles, CA, for defendant Steven D. Hogge, etc. et al.

Before PREGERSON, NOONAN and TASHIMA, Circuit Judges.

Opinion by Judge NOONAN; Opinion concurring in part, dissenting in part by Judge PREGERSON.

## OPINION

NOONAN, Circuit Judge.

Two cases have been consolidated in this appeal. In the first, Raychem Corporation (Raychem) sued Bourns, Inc. (Bourns) for misappropriating Raychem's confidential information and trade secrets. This suit resulted in a jury verdict for Raychem, a remittur by Raychem, and a judgment in its favor, which Bourns appeals.

In the second case, Bourns sued Raychem for violation of the antitrust laws. At the end of two trials, a jury returned a verdict in Bourns' favor but not as much as it expected. Bourns appeals various rulings in both trials. Raychem appeals the denial of its motion for judgment as a matter of law and the fee awarded Bourns' counsel.

We set out each case in turn.

## I. RAYCHEM'S MISAPPROPRIATIONS CASE.

### FACTS

In the 1970's, Raychem, a Delaware corporation engaged in the production of materials, began work on developing a device for controlling power surges. The work resulted in two layers of conductive foil surrounding a mixture of a nonconductive polymer and conductive carbon black. When current in the device becomes excessive, its lattice bonds break and stop the current; on cooling, the lattice reforms and current automatically resumes. This simple and elegant device is known as a polymeric positive temperature coefficient device or PPTC. In the 1980's, Raychem became the first mass producer of PPTCs. In 1988, Raychem licensed Bourns, a California corporation engaged in distributing and manufacturing electronic components, to distribute PPTCs in Europe for a limited range of applications.

By 1992, Raychem had committed $75 million to the development of its PPTC business, but was uncertain as to how successful it would be. It commissioned its national sales manager for PPTC business, Steve Hogge, to be "the coleader" of a team of fifteen technologists and marketing specialists to make a strategic analysis of its PPTC business. The team drew on internal interviews with the company's technologists and manufacturing people as well as with customers and outside technologists. The resulting plan, drafted by Hogge, was classified by the company as confidential and was intended to influence its decision-making on nearly $100 million worth of investment and to be used for further research allocations. On becoming an employee of Raychem in 1986, Hogge had signed a contract agreeing to keep in confidence any proprietary information he received from the company. He had further agreed on termination of his employment to deliver to the company any company documents or data in his possession.

At the end of December 1992, Hogge left Raychem. In violation of his contract with the company he took the strategic plan he had drafted and other proprietary information belonging to the company. His first plan was to develop his own company, but in March 1994 Hogge approached Bourns with a plan for marketing PPTCs. Parts of the plan were copied verbatim from Raychem's strategic plan; even typographical errors were faithfully reproduced. Gordon Bourns, president of Bourns, responded to Hogge and met with him in April and then almost weekly in the period May 1994 through July 1994. Hogge agreed not to tell Raychem of these conversations. By May 1994, Hogge was working on a PPTC plan for Bourns. By June 1994, Hogge was interviewing former and current Raychem employees for jobs at Bourns. Bourns, which was negotiating

for more licenses from Raychem, denied to Raychem that Hogge was working for it.

In August 1994, Hogge, on the advice of lawyers for Bourns, sent a letter to Raychem untruthfully denying that he was aware of having received any sensitive information from Raychem. Hogge's letter also denied that he had any Raychem documents in his possession. At trial, Hogge testified that this statement was truthful because he had burned the documents on August 19, 1994, two days after getting a letter from Raychem inquiring about them. This testimony was contrary to Hogge's deposition testimony that he burned the documents after August 30, 1994 when he had received from Raychem a copy of his exit interview there and had been reminded that he had promised to return all documents to the company. By his new agreement with Bourns, Hogge had the right to 30% of the profit generated by Bourns' new PPTC business, up to a cap of $14 million on the total to be divided.

On October 1, 1994, Bourns hired Chi-Ming Chan, a former employee of Raychem, to supervise the technical work necessary for Bourns to produce PPTCs. A memo marked "Confidential" and dated August 12, 1994 from Hogge to Bourns management had urged the speedy conclusion of an agreement with Chan who was "in a rather unique position to accomplish what we are asking based on his access to facilities, people and his training and experience.... CMC will be able to deliver to us a fully capable manufacturing cell for the PPTC business.... First of all getting someone like CMC onboard for this project is critical to its success both in terms of the probability of developing the material, and time to market." Chan went to work for Bourns in Hong Kong. There he was joined by another ex-Raychem employee, Mike Zhang.

As early as May 1994, a plan drafted for Bourns by Hogge had recommended "the acquisition of the basic PPTC technology either through the acquisition of ex-Raychem personnel or Thermacon." Raychem acquired Thermacon in June 1994, so only the first alternative remained. In September 1994, the general manager of Bourns presented a memorandum to the Bourns board of directors stating: "The general approach to manufacturing development is to hire a(sic) former Raychem employees in a consultant capacity to develop the formulations, compounding and initial manufacturing processes associated with core material." Employing Zhang, Chan, and Hogge, Bourns carried out this plan. Within 20 months, Bourns brought PPTC products to market.

## PROCEEDINGS

In December 1994, Raychem sued Bourns in San Mateo Superior Court for its actions in regard to Raychem's former employees, confidential information and trade secrets. This case was ultimately removed by Bourns on the ground of diversity to federal district court and tried to a jury in January 2000. The jury awarded Raychem $26 million compensatory damages against Bourns and $13 million in punitive damages, as well as $4 million against Hogge. The district court reduced the compensatory damages against Bourns to $9 million and against Hogge to $500,000 and the punitives to $9 million. Raychem accepted the remittitur.

Bourns appeals.

## ANALYSIS

*Jury Instructions.* Bourns focuses on a jury instruction that read:

You may find misappropriation where it is inevitable that a former employee would use his or her former employer's trade secrets in working for a competi-

tor. Thus, Raychem or Thermacon may support their claim of trade secret misappropriation by demonstrating that Mr. Hogge, Mr. Zhang or Dr. Chan's employment with Bourns inevitably led them to rely on or disclose Raychem's or Thermacon's trade secrets.

In making this determination, you should consider whether the new employment is likely to result in the disclosure of a former employer's trade secrets, or whether it would be impossible for an employee to perform his or her new job without using or disclosing those trade secrets.

Bourns contends that the references to "inevitable disclosure," to jury consideration of likelihood of disclosure, and to jury consideration of the impossibility of Hogge, Chan, and Zhang not using trade secrets add up to an instruction contrary to California's policy of permitting and even encouraging mobility among employees. It argues that the district court erred in referring to the "inevitable disclosure" doctrine in these cases because they allowed Raychem to circumvent the requirement of showing an actual misappropriation of trade secrets. Instead, they permitted the jury to rely on evidence that the jobs taken by former Raychem employees at Bourns were so similar that "it would be impossible for an employee to perform his or her new job without using or disclosing those trade secrets."

Bourns correctly asserts that no California court has adopted the inevitable disclosure doctrine. In fact, the only published California decision addressing the inevitable disclosure doctrine held that "the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets." *Whyte v. Schlage Lock Co.,* 101 Cal.App.4th 1443, 125 Cal.Rptr.2d 277, 294 (Ct.App.2002). Bourns further contends

that, even if California had adopted the inevitable disclosure doctrine, it was error to apply the doctrine in a case in which damages, rather than injunctive relief, were sought.

We need not decide whether the California Supreme Court would adopt the inevitable disclosure doctrine nor whether the doctrine can properly be used to prove actual misappropriation in an action for damages because, even assuming that the complained-of instructions were erroneous, any error was harmless. "[A]n error in instructing the jury in a civil case does not require reversal if it is more probably than not harmless." *Mangold v. Cal. Pub. Util. Comm'n,* 67 F.3d 1470, 1473 (9th Cir.1995) (quoting *Benigni v. City of Hemet,* 879 F.2d 473, 479 (9th Cir.1988)). Although some of the instructions suggest that proof of inevitable disclosure could replace proof of actual misappropriation, those instructions were embedded in instructions that qualified them and gave the law as Bourns says it should have been given.

The jury was instructed that mere similarity between the jobs was not enough to support a finding of misappropriation. First the court instructed the jury that "Raychem ... must prove, by a preponderance of the evidence ... that Bourns and/or Hogge have misappropriated Raychem's ... trade secret." Then immediately preceding the instruction objected to, the court instructed:

An employee has a right, after the termination of his or her employment, to use general knowledge or skills or experience relating to a business and to use information that is not the property of his or her former employer.

Immediately following the instruction to which Bourns objects, the court instructed:

An employee has the right to accept employment in the field in which he or she is trained. Simply because an em-

ployee works in a similar position for a competitor of his or her former employer does not by itself prove misappropriation of the former employer's trade secrets.

The court went on to instruct:

Matters of broad public knowledge or general knowledge in the industry cannot constitute confidential information or trade secrets of Raychem or Thermacon.... It is not unlawful for a business to solicit the employee of a competitor, so long as one does not use unlawful means or engage in acts of unfair competition.

Viewed in context, the instructions as a whole did not allow the jury to find actual misappropriation based on inevitable disclosure alone. Taken together, the instructions indicate that, although the similarity of the positions at the two companies was some evidence of misappropriation, proof that trade secrets were actually disclosed or used by the employee was necessary for a verdict in Raychem's favor. Any error in including the inevitable disclosure instruction was, more probably than not, harmless.

*Sufficiency of the Evidence of Misappropriation.*

■ Bourns moved for a directed verdict, then for judgment notwithstanding the verdict, and now for reversal on the grounds that Raychem did not identify the trade secrets with particularity and that what Raychem claimed as trade secrets were in the public domain or made available to the public by being set out as teaching in Raychem patents. Each time Bourns has had to meet a high legal standard: to show "without weighing the credibility of the witnesses there can be but one reasonable conclusion to the verdict." *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239 (1943). In each instance Raychem has disputed

Bourns' factual assertions and offered witnesses, who, if believed, would prove its trade secrets to have been taken. We cannot enter into this conflict of witnesses and, like the district court, we find that Raychem described its secrets with sufficient specificity, the jury was properly instructed that public knowledge could not be a secret, and that there was "ample evidence in the record supporting the jury's conclusion."

*Sufficiency of the Evidence of Bourns' Interference With Raychem's Contracts with Hogge, Chan, and Zhang.*

■ Here again Bourns tries for the third time to obtain a ruling in its favor as a matter of law where the evidence, to say the least, is in dispute. Bourns did not deny that it was aware of the agreements the Raychem employees had entered into with their employer to keep its information confidential. As the district court observed on the basis of the evidence at trial, "Bourns placed such employees in positions where it was virtually inevitable that they would use such knowledge" and "took virtually no precautions to ensure that such employee did not use protected information." Bourns showed its awareness of its illegal conduct by covering up its use of the Raychem information. This tort of interference with the employees' contracts is distinct from Bourns' violation of the statutory trade secrets act. Cal. Civil Code § 3426.7(b)(2). *Cf. Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1169 (9th Cir.1998).

■ *Raychem's Damages.* Bourns denies that Raychem proved that it suffered $9 million in damages. Raychem replies by pointing to Bourns' enrichment by its torts. According to Hogge, "the burn rate," or development cost, on PPTCs was $3 million per year. According to credible

evidence from the industry, Bourns saved at least three years of development by its torts. As the district court found, this unjust enrichment is fairly recoverable by Raychem.

Emphasizing "the egregiousness of Bourns' malfeasance," the district court awarded punitives of $9 million against Bourns or, in the alternative, exemplary damages under Cal. Civil Code § 3426.3(c) in the same amount. Bourns challenges this result by denying that Raychem proved its claims for compensatory damages. We have already noted the failure of this argument.

*Hogge's Appeal. Mutatis mutandis*, Hogge makes the same arguments on appeal as Bourns. He fares no better.

For the reasons stated, the judgments of the district court in No. 01–56246 and No. 01–56252 are AFFIRMED.

## II   BOURNS' ANTITRUST CASE.

### FACTS

PPTCs are used in a variety of products, including automobiles, batteries, computers, consumer electronics, industrial controls, and instruments of telecommunications. PPTCs are not the only devices available to control excess current but, depending on price and supply, may be preferable in many contexts to competing methods such as fuses or ceramic positive temperature coefficients or bimetallics breakers. Raychem used its patents to achieve a dominant position where PPTCs were highly preferred.

Beginning in 1988 with its role as a PPTC distributor for Raychem in Europe, Bourns contemplated the possibility of itself becoming a maker of PPTCs. Indeed, as Bourns puts it in its brief, as early as 1987 Bourns had "proposed the obvious—a marriage in which Raychem contributed its technology with Bourns to provide the

manufacturing and marketing expertise." The proposal was not accepted. Bourns took no steps to prepare to manufacture PPTCs until sometime in 1994. On December 2, 1994, its board approved a proposal to produce PPTC with Hogge leading the effort.

### PROCEEDINGS

In 1995, after Raychem had brought its action for misappropriation and after discovery in connection with that litigation, Bourns brought this suit against Raychem in the district court. Bourns' first amended complaint charged Raychem with a variety of acts violative of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. In the course of the proceedings, a number of these charges were eliminated by rulings of the district court that have not been appealed. The heart of Bourns' case remained: Raychem had prevented Bourns from competing in the PPTC business by threatened enforcement of its invalid patents.

The jury that heard the case returned a special verdict, stating that Bourns had proved by clear and convincing evidence that Raychem had acquired four specified patents by intentional fraud on the Patent Office and had threatened to enforce these patents against Bourns and that Raychem "acquired or maintained monopoly power in a relevant market" by these threats. To the question, "identify the relevant market or relevant markets in which Raychem willfully acquired or maintained monopoly power," the jury replied: "PPTC/Primary Lithium Batteries." To the question, "On what date after May, 1994, did Bourns first have the intent and preparedness to enter the business of making and selling PPTC devices?" The jury answered: "December 1, 1994." The

jury stated that the damages Bourns suffered amounted to $64 million.

Raychem moved for judgment notwithstanding the verdict on the ground that Bourns had established no antitrust injury after December 1, 1994, the date the jury had determined that it had antitrust standing as a potential competitor. The district court denied the motion, stating, "Here the jury could have reasonably concluded that Raychem's threatened enforcement of the challenged patents in both May and September 1994 had continuing effects on Bourns so as to cause antitrust injury."

The district court did grant Raychem's motion for a new trial on damages on the ground that the $64 million verdict was not supported by the evidence and was inconsistent with the special verdict establishing the relevant market as "primary lithium batteries."

Bourns and Raychem each appeal.

## ANALYSIS

■ *Antitrust Injury.* Bourns' case rested on what is referred to as its "Walker Process claim," shorthand for reference to *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In that case the Supreme Court held that possession and use of a fraudulently-acquired patent was not a per se violation of the Sherman Act but could be treated as an offense under the antitrust laws if the patent was employed to produce monopoly power in a specified market. Bourns' successful attack on the Raychem patents and its establishment of the lithium batteries market as affected by the patents was not the end of Bourns' case. Bourns had to show that, at the time Raychem threatened it with patent litigation, it was more than a hopeful bystander. Bourns had to show that Raychem's fraudulent bluffing had inflicted antitrust injury on it.

■ Only an actual competitor or one ready to be a competitor can suffer antitrust injury. The district court ruled that as a matter of law Bourns did not have the intent and preparedness to be a competitor in the PPTC business prior to May, 1994. The jury found that the necessary intent and preparedness were not present until the day before the Bourns' board action of December 2, 1994. Bourns challenges this determination, but we cannot say that either the district court's ruling or the jury's finding was against the weight of the evidence.

■ Bourns points to evidence of its desire to get into the PPTC business: its "marriage proposal" to Raychem in 1987; its acceptance of the private licensing agreement from Raychem; its repeated efforts to get a manufacturing license from Raychem. Each of these examples of Bourns' desire to enter the business might count as evidence of intent to enter the business. At the same time each example shows Bourns unprepared to enter the business. Bourns was wishing; it was not assembling the personnel, the equipment, the facilities, nor acquiring the knowledge, nor allocating the capital to put it into the production of PPTCs. It was unprepared to compete. *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 452 (9th Cir.1985), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).

As the district court observed in its ruling that Bourns was unprepared, that Bourns was an electronics firm did not establish that it "had the experience and background necessary to manufacture PPTCs." Bourns had no experience working with carbon black or with the processes of extrusion and lamination. Bourns did not have a place or equipment to produce the PPTCs. When on December 2, 1994, Bourns voted to embark on the busi-

ness, it opened a new facility in Hong Kong to do the manufacturing and purchased new equipment for the facility. Before it acquired Hogge, Chan, and Zhang, Bourns did not have the people for the PPTC business. Until the Bourns board acted on December 2, 1994, Bourns had not decided to allocate funds. Bourns failed every test of preparedness to be a PPTC competitor prior to December 1, 1994. *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 (9th Cir.1993). Like the plaintiff in that case, Bourns had no product and no contracts or arrangements to produce the product. *Id.* at 1466. Up to the date determined by the jury, Bourns was a bystander.

The threats that Bourns showed were made by Raychem to enforce its patents were made in May 1994 and September 1994. They were threats to a bystander who was pawing the ground: don't get into our turf. They were not threats to a competitor or to a business prepared to be a competitor. They did constitute an abuse of Raychem's invalid patents. They did not constitute antitrust injury for the threats were not addressed to a business in the market or to a business that was prepared to enter the market.

The district court, denying Raychem's motion for judgment notwithstanding the verdict, speculated that the threats could have "continuing effects on Bourns so as to constitute antitrust injury." What were these continuing effects? Bourns does not name them. Bourns does argue that but for the threats it would have been ready to sell "its own PPTC product by December 1, 1994." It is very difficult to see how this claim can be made. Working as hard as it could after December 1, 1994, with the help of the ex-Raychem employees, Bourns had no product to sell for another 20 months. Not the slightest evidence was

offered that any threat of Raychem prevented Bourns from selling PPTCs prior to September 1996 when Bourns actually entered the market.

Standing to bring an antitrust action is a requirement because antitrust injury is a necessary element of an antitrust suit. *See* P. Areeda and H. Hovenkamp, *Antitrust Law* (2d ed.2001) ¶ 337. A "nascent" business—one that is merely a gleam in the eye and a hope in the heart of its promoters—does not possess the property to which antitrust injury can be done. *Id.* ¶ 349. Bourns, up until December 1994, was such a firm so far as the PPTC business was concerned. Suffering no antitrust injury before the December date because it was unprepared, and suffering no antitrust injury after the December date because no patent threats were thereafter made, Bourns has no antitrust case. Raychem is entitled to judgment as a matter of law.

For the reasons stated, the judgment of the district court in the antitrust case, No. 01–56245 is REVERSED, and the case is REMANDED for entry of judgment for Raychem. The fee award falls with the reversal of the judgment.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's decision to affirm the jury's determination that Bourns was liable for interfering with Raychem's employment contracts and misappropriating Raychem's trade secrets. But I dissent from the majority's decision to reverse the jury's verdict in favor of Bourns on its anti-trust claims against Raychem concerning its unlawful monopolization of the Polymeric Positive Temperature Coefficient ("PPTC") market in violation of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247

(1965) (hereinafter *Walker Process* ), and Section 2 of the Sherman Act. First, the majority errs by reweighing the evidence presented to the jury regarding Raychem's anti-trust liability and by reversing the jury's determination that Raychem by threatening to enforce its fraudulently obtained patents against Bourns unlawfully thwarted Bourns' effort to enter into the PPTC market. By doing so, the majority contravenes our rule that "the weight of the evidence[is an] issue[ ] for the jury that [is] generally not subject to appellate review." *Murray v. Laborers Union Local No. 324,* 55 F.3d 1445, (9th Cir.1995). In addition, the majority errs by reasoning that Bourns could not have suffered an anti-trust injury since it did not have a PPTC product to sell for twenty months after it achieved anti-trust standing to sue Raychem.

In *Walker Process* the Supreme Court held that an injured party may bring a suit for anti-trust damages under Section 2 of the Sherman Act against a company that attempts to monopolize a market by threatening to enforce a patent obtained by fraud. To sustain a *Walker Process* claim, a party must prove that "(1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent applicant, he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained; and (2) all the elements otherwise necessary to establish a § 2 monopolization charge." *Walker Process,* 382 U.S. at 179, 86 S.Ct. 347 (Harlan, J. concurring).

The majority does not question the jury's special verdict that Bourns had proved by clear and convincing evidence that Raychem unlawfully procured four of its PPTC patents by intentional fraud on the United States Trademark and Patent Office, or that Bourns had anti-trust standing to bring suit against Raychem on December 1, 1994. The majority also does not dispute that Raychem made several threats to Bourns to enforce its fraudulently obtained patents against Bourns if Bourns entered the PPTC market. Instead, the majority reversed the jury's verdict in favor of Bourns because (1) Bourns did not present adequate evidence that it suffered antitrust injury since it had no product to sell for twenty months after it acquired standing to bring a *Walker Process* claim, and (2) Raychem threatened to enforce its fraudulent patents against Bourns before the date that Bourns acquired its anti-trust standing.

The majority's reliance on whether Bourns had a PPTC product in the market as an indicator that Bourns suffered anti-trust injury misses the point of the *Walker Process* inquiry: a *Walker Process* claim is designed to prohibit a dominant party from willfully and fraudulently monopolizing a market by deterring another company's attempt to enter that market. As the Supreme Court described in *Walker Process:*

> A patent by its very nature is affected with a public interest. * * * (It) is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

*Walker Process,* 382 U.S. at 177, 86 S.Ct. 347 (*citing Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). Because a party who wishes to enter a market often is deterred from

doing so as a direct result of a monopolizing party's threats to enforce its fraudulent patents, *Walker Process* only requires that to have standing to sue, a company which wishes to enter the market demonstrate that it was a *potential competitor*, not an *actual competitor*. Thus, "our circuit, along with most circuits, has held that a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so." *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir.1985), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985). The majority errs by holding that Raychem's threats to enforce its patents against Bourns could not have caused Bourns anti-trust injury because it took Bourns twenty months to enter the PPTC market after it acquired standing to bring a *Walker Process* claim.

Second, the majority errs by reweighing the evidence when it reconsidered the effect that Raychem's repeated threats to Bourns had on its ability to enter the PPTC market. The applicable standard of review is whether the jury's verdict is supported by substantial evidence. *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999), *cert. denied,* 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Id.* (quoting *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987)). This court "review[s] for abuse of discretion the district court's denial of a motion for a new trial grounded on the assertion that the jury's verdict was against the clear weight of evidence." *Id.* Furthermore, "the credibility of witnesses and the weight of the evidence are issues for the jury that are generally not subject to appellate review." *Murray,* 55 F.3d at 1452.

During trial, Bourns introduced evidence that throughout its business relationship with Raychem, it sought to dominate the PPTC market by making it clear to Bourns and other competitors that Bourns could not enter the market because of Raychem's PPTC patents, which were obtained by fraud. On ten occasions from 1986 to 1993, Raychem rejected Bourns' request for a PPTC manufacturing licence. Raychem informed Bourns that it could never enter the market without a patent license and that it had successfully enforced the patents in question against another competitor, Therm–O–Disc. In May 1994, Raychem informed Bourns that it "should never think about" manufacturing PPTCs and reminded Bourns of its 1986 suit against Therm O Disc. In September 1994, when Bourns informed Raychem that it was considering manufacturing PPTCs, Raychem warned that it had "so many patents nobody ever succeeded to go around them that I wouldn't even think about doing this." Finally, Raychem informed its customers that Bourns' potential PPTC products would be in violation of its patents.

After an eight week trial, the jury found that Bourns proved by a preponderance of the evidence that Raychem caused Bourns to suffer anti-trust injury by enforcing or threatening to enforce its fraudulently obtained patents against Bourns. The jury also found that Raychem willfully acquired monopoly power in the PPTC market by its unlawful conduct. By reversing the jury's sound judgment, I submit that the majority erroneously substituted its own determination of the evidence for the jury's verdict in contravention of *Murray,* 55 F.3d at 1452. None of this court's prior decisions require as a matter of law that a company unlawfully monopolizing the mar-

ket by threatening competitors with fraudulently obtained patents make such unlawful threats after the time when a potential competitor is prepared to enter the market. The jury weighed the evidence of Raychem's unlawful threats to Bourns and concluded that Raychem unlawfully deterred Bourns from entering the PPTC market in violation of *Walker Process.*

Accordingly, I affirm in part and dissent in part.