**RITZ CAMERA & IMAGE, LLC, a Delaware limited liability company, on behalf of itself and others similarly situated, Plaintiff,**

v.

**SANDISK CORPORATION; Eliyahou Harari, Defendants.**

Case No. 5:10–cv–02787–JF/HRL.

United States District Court,
N.D. California,
San Jose Division.

Feb. 24, 2011.

Colleen Duffy-Smith, Morgan Duffy-Smith & Tidalgo, LLP, San Jose, CA, Beverly C. Moore, Joseph S. Hall, Kfir B. Levy, Melanie L. Bostwick, Kellogg Huber Hansen Todd Evans & Figel, P.L.L.C., Robert Stephen Berry, Berry Law PLLC, Steven F. Benz, Kellogg, Huber, Hansen, Todd, Washington, DC, for Plaintiff.

Raoul Dion Kennedy, David W. Hansen, James Patrick Schaefer, Skadden Arps Slate Meagher & Flom LLP, San Francis-

co, CA, Lara Anne Rogers, Skadden, Arps, Slate, Meagher and Flom LLC, Palo Alto, CA, for Defendants.

ORDER[1] GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT

JEREMY FOGEL, District Judge.

## I. BACKGROUND

On June 25, 2010, Plaintiff Ritz Camera & Image, LLC ("Ritz") filed the instant action against Defendants SanDisk Corporation ("SanDisk") and Eliyahou Harari ("Harari"), alleging violations of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 ("Sherman Act"). Ritz filed its first amended complaint ("FAC") as of right on August 25, 2010. On behalf of a purported class, Ritz asserts claims for conspiracy to monopolize and monopolization of the flash memory market. In particular, Ritz alleges that SanDisk and Harari conspired to monopolize and have monopolized the market for NAND flash memory products[2] through the assertion of fraudulent patents. FAC ¶¶ 124–35. Ritz claims that Defendants have reduced competition in the market by pursuing unfounded actions for patent infringement and by engaging in retaliatory conduct toward consumers who use competing products. *Id.*

Ritz alleges that Harari tortiously converted flash memory technology owned by his former employer Wafer Scale Integration ("WSI"), which led to the issuance of U.S. Patent Nos. 5,172,338 and 5,991,-517, referred to herein as the '338 and '517 patents or the "crown jewel patents."[3] *Id.* ¶¶ 93–102, 126, 132. According to Ritz, Harari obtained these patents by intentionally failing to disclose invalidating prior art to the U.S. Patent and Trademark Office ("USPTO") and by making affirmative misrepresentations to the USPTO. *Id.* ¶¶ 35–73, 126, 132. Allegedly, Harari and his newly-formed company—SanDisk—then exploited the crown jewel patents by suing competitors for infringement. *Id.* ¶¶ 110–122, 126, 132. Ritz also claims that Defendants threatened competitors' customers through harassing litigation and sales tactics, and retaliated against Ritz specifically by terminating their business relationship after the commencement of the instant litigation. *Id.*

Ritz alleges that Defendants' enforcement of the subject patents has suppressed competition in the NAND flash memory product market, as evidenced by the March 2008 market departure of SanDisk's largest competitor, STMicroelectronics, Inc. ("STM"). *Id.* ¶ 115. Ritz also claims that Defendants entered into an anticompetitive settlement agreement with STM in an effort to drive STM from the market. *Id.* ¶¶ 112–120, 126, 132. These actions allegedly have resulted in reduced market competition and a steep increase in prices for NAND flash memory. *Id.* ¶¶ 129, 134.

Defendants move to dismiss the FAC pursuant to Fed.R.Civ.P. 12(b)(6). They argue that Ritz (1) has failed to allege the

---

1. This disposition is not designated for publication in the official reports.

2. NAND flash memory is a form of digital storage technology used in consumer electronic devices. FAC ¶¶ 1–2. It is available in a "raw" or a "finished" format. *Id.* "Raw" flash memory is the basic flash memory wafer that is produced by a fabrication plant or fab. *Id.* "Finished" flash memory products are used in or with various electronic products such as personal computers and digital cameras. *Id.*

3. Ritz also alleges that Defendants used the misappropriated technology to obtain a 1989 patent that served as a predecessor to the crown jewel patents. *Id.* ¶ 101. Ritz does not allege that Defendants sought to enforce the 1989 patent.

existence of an antitrust conspiracy; (2) lacks standing to pursue a *Walker Process*[4] fraud claim; (3) lacks antitrust standing; and (4) has failed to allege a relevant antitrust market, which is a necessary predicate to any antitrust claim. Ritz opposes the motion. The Court heard oral argument on December 17, 2010. For the reasons set forth below, the motion will be granted in part and denied in part.

## II. LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.2008). For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, a court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact

contained in the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–755 (9th Cir.1994).

Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir.1996).

## III. DISCUSSION

### A. *Walker Process Standing*

▮ The Court first must determine whether Ritz has standing to bring a *Walker Process* claim, as each of Ritz's claims is dependent upon the theory that Defendants have engaged in the enforcement of fraudulently-obtained patents. Neither the Supreme Court nor the Ninth Circuit has determined whether direct purchasers, such as Ritz, have standing to assert a *Walker Process* claim.[5]

Generally, *Walker Process* challenges are brought by competitors as counterclaims in patent infringement actions. *In re DDAVP*, 585 F.3d 677, 689 (2d Cir. 2009). *Walker Process* claims reside at the junction of patent and antitrust law, allowing plaintiffs to "strip [a patent-holder] of [his] exemption from the antitrust laws" if his patent has been procured by fraud. 382 U.S. at 177, 86 S.Ct. 347. The Supreme Court's decision in *Walker Process* permits plaintiffs to seek damages under § 2 of the Sherman Act for "monop-

---

4. *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

5. Defendants argue that the Ninth Circuit in fact has held that only potential competitors who are ready to enter the market have standing to bring *Walker Process* claims. *Bourns,*

*Inc. v. Raychem Corp.*, 331 F.3d 704, 711–12 (9th Cir.2003). However, *Bourns* did not present the issue that is before this Court. *See In re Netflix Antitrust Litigation*, 506 F.Supp.2d 308, 315–16 (N.D.Cal.2007) ("The *Bourns* decision did not squarely address the question of consumer standing.")

olistic action taken under ... fraudulent patent claim[s]." *Id.* at 176, 86 S.Ct. 347.

Ritz argues that because the Supreme Court did not limit its holding to a particular class of plaintiffs, direct purchasers and competitors are equally entitled to standing. *Walker Process,* 382 U.S. at 176, 86 S.Ct. 347. ("The gist of Walker's claim is that since [Defendant] obtained its patent by fraud it cannot enjoy the limited exception to the prohibitions of § 2 of the Sherman Act, but must answer under that section ... to *those injured* by any monopolistic action taken under the fraudulent patent claim.") (emphasis added). It contends that both precedent and public policy support this interpretation. *In re Netflix Antitrust Litigation,* 506 F.Supp.2d 308, 316 (N.D.Cal.2007) relied on *Molecular Diagnostics Laboratories v. Hoffmann–La Roche, Inc.,* 402 F.Supp.2d 276, 280 (D.D.C.2005) in concluding that, "[e]ven though *Walker Process* claims are predicated on enforcement of a fraudulently-obtained patent, the harm still accrues directly to consumers.... Accordingly, if plaintiffs can plead the other elements of their *Walker Process* claim, they have standing." [6] Ritz maintains that the policy underlying *Walker Process* claims is to redress anticompetitive conduct, and that, "[i]t would be perverse to deny standing to the main targets of [such] conduct." Opp. Br. at 21.

Defendants argue that Ritz overlooks persuasive authority holding that purchaser plaintiffs lack standing. According to Defendants, it is generally accepted that consumers lack standing to assert a *Walker Process* claim unless the patent at issue is "already unenforceable due to inequita-ble conduct." MTD at 19 (quoting *In re DDAVP,* 585 F.3d 677 at 691–92); *See also Kroger Co. v. Sanofi–Aventis,* 701 F.Supp.2d 938 (S.D.Ohio 2010); *Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc.,* No. CV 02-2443–JFW, 2009 WL 3877513, at *4 (C.D.Cal. Oct. 8, 2009); *In re K–Dur Antitrust Litigation,* No. 01–1652(JAG), MDL No. 1419, 2007 WL 5297755 (D.N.J. Mar. 1, 2007); *In re Ciprofloxacin Hydrochloride Antitrust Litigation,* 363 F.Supp.2d 514, 542 (E.D.N.Y.2005); *In re Remeron Antitrust Litigation,* 335 F.Supp.2d 522 (D.N.J. 2004); *Asahi Glass Co. v. Pentech Pharms, Inc.,* 289 F.Supp.2d 986 (N.D.Ill. 2003).

However, many of these cases involve issues not presented here. In *Kroger,* the patent at issue already had been found valid in prior litigation. 701 F.Supp.2d at 963 ("The Court is loathe to grant such an expansion of potential patent challengers by conferring standing to direct purchasers of a drug for which the patent has been. judicially determined to be valid and enforceable."). In *Kaiser,* the court dismissed the plaintiff's *Walker Process* claim because of the indirect nature of the alleged antitrust injury. 2009 WL 3877513, at *4 ("it is clear that the injury allegedly suffered by Plaintiff in its Hatch–Waxman *Walker Process* claim is not the type of 'direct' or 'proximate' injury that results in antitrust standing."). Likewise, *In re K–Dur, In re Ciprofloxacin,* and *Asahi* each involved a *Walker Process* claim brought by an indirect purchaser. Here, Ritz is a direct purchaser of NAND flash memory, and the validity of the patents at issue has never been resolved.

6. Defendants seek to distinguish *Netflix* by arguing that it turned on the question of antitrust injury, and that its discussion of consumer standing was *dicta.* MTD at 19 n. 6. However, this Court agrees with Ritz that the question of standing was germane to the reso-lution of the case. Opp. Br. at 17. Indeed, the court could not have reached the issue of antitrust injury without finding that the plaintiffs had standing to pursue a *Walker Process* claim.

The Supreme Court's decision in *Walker Process* places no limitation on the class of plaintiffs eligible to bring a *Walker Process* claim,[7] and only one court has held expressly that a direct purchaser lacks standing to sue.[8] Even in *DDAVP*, the Second Circuit declined to decide "whether purchaser plaintiffs *per se* have standing to raise *Walker Process* claims." 585 F.3d at 691–92. The court specifically limited its holding to the facts presented, deciding only that it is acceptable for consumers to bring a *Walker Process* claim when the relevant patent already has been tarnished by a finding of inequitable conduct.

> In this case, the plaintiffs are challenging an already tarnished patent. We are able to grant them antitrust standing without altering the typical limits on who can start a challenge to a patent's validity. We therefore hold only that purchaser plaintiffs have standing to raise *Walker Process* claims for patents that are already unenforceable due to inequitable conduct.

585 F.3d at 691–92

Ritz argues that the patents at issue in this case have been tarnished by this Court's own determination in the SanDisk–STM litigation that there were triable issues of fact as to whether SanDisk procured the patents by fraud. *See* Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment, *SanDisk Corp. v. STMicroelectronics, Inc., et al.*, No. C 04–4379–JF, Dkt. 273 at 7–13.[9] Defendants are correct that a denial of a motion for summary judgment is not tantamount to a finding of inequitable conduct. However, because of the heightened evidentiary requirements necessary for a showing of fraud, few *Walker Process* claims survive summary judgment. Those that do raise at least some question as to the validity of the subject patent.

Citing *DDAVP*, Defendants argue that, "giving *Walker Process* standing to … [direct purchaser] plaintiffs … could result in an avalanche of patent challenges, because direct purchasers otherwise unable to challenge a patent's validity could do so simply by dressing their patent challenge with a *Walker Process* claim." 585 F.3d at 691 (discussing concerns raised by Defendants). However, because viable *Walker Process* claims are rare, it is unlikely that many direct purchasers will be in the same position as Ritz is here. Moreover, as the Supreme Court observed in *Walker Process*, "the interest in protecting patentees from 'innumerable vexatious suits' [may not] be used to frustrate the assertion of rights conferred by the antitrust laws." 382 U.S. at 176, 86 S.Ct. 347 (quoting *Mowry v. Whitney*, 81 U.S. 434, 441, 14 Wall. 434, 20 L.Ed. 858 (1871)).

Having concluded that Ritz has *Walker Process* standing, the Court now must determine whether Ritz has met the pleading requirements of Fed.R.Civ.P. 9(b), and whether the alleged anticompetitive conduct is sufficient to show a cognizable antitrust injury.

---

7. 382 U.S. at 176, 86 S.Ct. 347.

8. *In re Remeron*, 335 F.Supp.2d 522 at 529 ("*Walker Process* and its progeny involve antitrust counterclaimants who were potential or actual competitors in patent infringement suits. In this case, … Plaintiffs were not party to the initial patent infringement suits … Accordingly, this Court finds that Plaintiffs do not have standing to assert Walker Process fraud claims …").

9. Case No. C 04–4379–JF was one of two actions brought by SanDisk against STM alleging infringement of the '338 and '517 patents, respectively. In that action, STM brought a *Walker Process* counterclaim identical to the claim asserted by Ritz in this case. On summary judgment, the Court held that the counterclaim was supported by sufficient evidence to proceed to trial.

## B. Fraudulent Procurement

■■■ "The first barrier for a *Walker Process* claimant to clear is the requirement that the patent be obtained through actual fraud upon the PTO. This question is governed by Federal Circuit law." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed.Cir.2007) (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed.Cir.1998) (*en banc* in relevant part)). A successful *Walker Process* plaintiff must show that: (1) the patent at issue was procured by knowing or willful fraud on the USPTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) there is independent evidence of a clear intent to deceive the examiner; (4) there is unambiguous evidence of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission; and (5) the necessary additional elements of an underlying violation of the antitrust laws are present. *Nobelpharma*, 141 F.3d at 1068–71; *see also In re Netflix*, 506 F.Supp.2d at 314.

Ritz alleges that in obtaining the crown jewel patents, SanDisk made affirmative misrepresentations to the USPTO and deliberately withheld material information, including key prior art, during reexamination of the '338 patent in 1996. FAC ¶¶ 35–73, 126, 132. Ritz claims that SanDisk intentionally mischaracterized the patent as describing a method for permanent inhibition of electrically erasable programmable read only memory ("EEPROM") in an effort to avoid invalidation by prior art.[10] *Id.* ¶ 44. As evidence that its patent described permanent inhibition, SanDisk referred to Latch 721—a one-way resettable latch featured in a diagram in the '338 patent. *Id.* Ritz alleges that the USPTO relied on Latch 721 in determining that the '338 patent claimed permanent inhibition and was unaware that the inventors of the patent had published an article describing Latch 721 as a two-way data latch. *Id.* ¶ 45–46. Ritz also alleges that the law firm responsible for prosecuting both crown jewel patents began keeping a record of prior invalidating art months before the 1996 reexamination but failed to disclose this fact to the USPTO. *Id.* ¶ 51. Ritz asserts that had the USPTO been aware of the prior art, the '338 patent would not have survived reexamination and the claims of the '517 patent would not have issued as written. *Id.* ¶ 54. Finally, Ritz alleges that neither patent would have issued in the first instance had the USPTO known that the applications were based upon stolen technology. *Id.* ¶ 72. Taken together, these allegations describe a clear deceptive intent that was present from the time Defendants first applied for the crown jewel patents. Moreover, they suggest that misrepresentations and omissions played a key role in the USPTO's determinations.

## C. Anticompetitive Conduct

"Fraudulent acquisition of the asserted patent . . . is the beginning, not the end, of the inquiry. [*Walker Process* claimants] must also show the basic elements of an antitrust violation defined by the regional circuit's law, including that the patentee's behavior was directed to a relevant product market." *Dippin' Dots*, 476 F.3d 1337 at 1348 (citing *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341, 1363 (Fed.Cir.2004), *rev'd on other grounds*, 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006)).

### 1. Relevant Market

■■ The Supreme Court has explained that the relevant market for antitrust pur-

---

10. The reexamination centered on whether the '338 patent had been preempted by a 1983 article that discussed an incremental method for programming EEPROM known as temporary inhibition. *Id.* ¶ 43.

poses is determined by the choices available to consumers. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir.2001). Put differently, products may be considered a part of the same market when "consumers view [them] as reasonable substitutes for each other and would switch among them in response to changes in relative prices." *Apple, Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190, 1196 (N.D.Cal.2008).

Ritz alleges that Defendants possess monopoly power within the market for raw and finished NAND flash memory products. FAC ¶ 25. Defendants claim that this all-encompassing definition is inappropriate because it includes products that are not reasonably interchangeable, such as the flash memory used in digital camera storage and that used in computer hard drives. However, the Ninth Circuit has observed that, "[d]efinition of the relevant market cannot be performed with mathematical accuracy; it is simply the recognition of a field in which meaningful competition is said to exist." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.1997). The definition need not be pled with specificity, and "[o]rdinarily, the relevant market is a question of fact for the jury." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir.1991); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.2008). Ritz claims that there are no substitutes for NAND flash memory to which consumers would switch in response to an increase in price. FAC ¶ 25. At the pleading stage, this is sufficient.

### 2. Antitrust Standing

■ "Only individuals who possess antitrust standing by virtue of having suffered such injury may sue to redress an antitrust violation." *In re Webkinz Antitrust Litigation*, 695 F.Supp.2d 987, 996 (N.D.Cal.2010) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529–535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). In the Ninth Circuit, antitrust standing is dependent upon: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir.1996) (citing *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Having alleged an injury that stems from unfair product overcharges, Ritz plainly has identified the measure of the harm. There is little risk of duplicative recovery, as might be the case when "every person along a chain of distribution [is permitted] to claim damages arising from a single transaction that violated the antitrust laws." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 475, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). The purported class is limited to direct purchasers of raw and finished NAND flash memory purchased from SanDisk after June 25, 2006. FAC ¶ 19. This limitation is sufficient at the pleading stage to address the fifth factor in the standing analysis.

The most difficult question is whether Ritz has alleged a cognizable antitrust injury. An antitrust plaintiff must allege: "(1) unlawful conduct, (2) causing an injury to plaintiffs, (3) that flows from that which makes the conduct unlawful, (4) that is of

the type the antitrust laws were intended to prevent ... [and] (5) that the injured party be a participant in the same market as the alleged malefactors." *Glen Holly Ent'mt., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir.2003) (internal citations omitted). As a direct purchaser of raw and finished NAND flash memory, Ritz properly may be considered a participant in the same market as Defendants. *See In re Netflix*, 506 F.Supp.2d at 315 (finding that purchasers of defendant's product are participants in the same market).

### a. Tortious Conversion

Ritz alleges that Harari tortiously converted NAND flash memory technology belonging to his former employer, WSI, and used it to obtain the crown jewel patents. FAC ¶¶ 93–102, 126, 132. It claims that but for the assertion of fraudulent patents, SanDisk's competitors would not have been driven from the market. Defendants argue that this alleged conduct cannot give rise to a cognizable antitrust injury because, "theft of a perfectly valid patent ... creates no monopoly power; it merely shifts a lawful monopoly into different hands." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984). However, this argument assumes the validity of the patents at issue, which would be inappropriate at the pleading stage in light of Ritz's *Walker Process* claim.

### b. Customer Threats and Sham Litigation

Ritz alleges that after fraudulently procuring the crown jewel patents, Defendants sought to enforce the patents through baseless infringement actions that caused STM to exit the market in March 2008 and prevented STM from forming a

competitive joint venture with Hynix, a leading semiconductor manufacturer.[11] FAC ¶¶ 110–122, 126, 132. As part of the campaign against STM, Defendants allegedly sought to drive away STM's customers by serving them with document and deposition subpoenas. *Id.* ¶ 110. Defendants resolved the STM litigation in 2009 through a confidential settlement that allegedly precluded STM from re-entering the relevant market and further cemented Defendants' monopoly.[12] *Id.* ¶¶ 112–120, 126, 132.

In addition, Defendants allegedly threatened their competitors' customers by warning that, "SanDisk will force them to purchase flash memory at disadvantageous prices and terms if they are later required to turn to SanDisk to purchase the necessary flash memory for their products." *Id.* ¶¶ 8, 110. As noted previously, Defendants terminated their supply contract with Ritz shortly after the instant lawsuit was filed. *Id.* ¶¶ 111, 126, 132.

For several reasons, Defendants argue that these allegations fall short. First, they point out that Ritz does not allege that any customers actually were driven away from competitors by Defendants' alleged threats. However, it is well established that threats alone are an inherent injury to competition. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (affirming lower court finding of *per se* violation of the Sherman Act based on competitor intimidation); *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 at 712 (suggesting that antitrust injury would have existed if threats were addressed to competitors).

---

11. Ritz alleges also that Defendants unlawfully asserted the '338 patent against Samsung Corporation ("Samsung") in 1996, which led to the reexamination of the patent later that year. FAC ¶¶ 41–46.

12. The settlement resolved all state and federal litigation between SanDisk and STM. *Id.* ¶ 112.

Second, Defendants claim that judicially noticeable facts show that they did not force STM from the market or thwart its prospective joint venture with Hynix. According to Defendants, STM made numerous SEC filings throughout its litigation with SanDisk in which it discussed the minimal risk posed by SanDisk's suits. Exs. G, H to Defendants' Request for Judicial Notice ("RJN"). They also point to additional SEC filings that allegedly prove that STM did not exit the market in 2008 but instead transferred its business to a joint venture with Intel Corporation, and to a November 2004 report to the SEC indicating that STM in fact entered into a joint venture with Hynix. RJN Exs. B–D.

█ Defendants observe correctly that the Court need not "accept as true allegations which are contradicted by documents which are properly considered on a motion to dismiss." *In re VISX, Inc. Sec. Litigation,* Nos. C 00–0649 CRB, C–00–0815 CM, 2001 WL 210481, *7 n. 1 (N.D.Cal. Feb. 27, 2001) (citing *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1296 (9th Cir.1998)). They also note that at least one other court in this district expressly took judicial notice of SEC filings in the context of a motion to dismiss. *Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.,* No. 09–5815 CW, 2010 WL 2198200, at *1 n. 2, 2010 Lexis 52985, at *2–3 n. 2 (N.D.Cal. May 28, 2010). However, while a court may take judicial notice of the *existence* of SEC filings, it may not take judicial notice of documents for the truth of disputed facts asserted therein. *See* Fed.R.Evid. 801(c); *Troy Group, Inc. v. Tilson,* 364 F.Supp.2d 1149, 1152 (C.D.Cal.2005) ("SEC filings 'should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the docu-

ments' contents.") (quoting *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996)). In *Ice Cream Distributors,* the court took judicial notice of SEC filings not to rebut the plaintiff's allegations but in order to verify the defendant's corporate hierarchy. 2010 WL 2198200, at *1 n. 2, 2010 Lexis 52985, at *2–3 n. 2. This Court declines to take judicial notice of the hearsay statements contained in the SEC filings at issue here.

Third, Defendants argue that the *Noerr–Pennington*[13] doctrine shields them from any liability arising from their litigation with STM or from litigation-related correspondence with STM customers. The *Noerr–Pennington* doctrine affords immunity from antitrust liability to citizens who petition the government for redress of grievances, including when they seek relief in the courts. "[C]onduct incidental to the prosecution of [a] suit" also is protected. *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,* 944 F.2d 1525, 1528–29 (9th Cir.1991) *aff'd* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). However, there are two recognized exceptions to this doctrine: (1) where a party engages in a "sham" petition intended only to "interfere directly with the business relationships of a competitor," or (2) where an asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process. California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

Defendants contend that Ritz cannot rely on the "sham" exception to *Noerr–Pennington* because this Court granted summary judgment in favor of SanDisk on this precise issue in the SanDisk–STM litigation. No. C 04–4379–JF, Dkt. 273 at 15

**13.** *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine* *Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

("The Court agrees that the results of the ITC investigations prevent a finding of sham litigation."). Ritz suggests that the outcome would have been different if the Court had analyzed the suit as part of an overall pattern of infringement actions. It claims that a different test is required where a plaintiff alleges that the defendant engaged in a "whole series of lawsuits" intended to quash competition. *USS–POSCO Indus. v. Contra Costa County Bldg. & Const. Trades Council, AFL–CIO,* 31 F.3d 800, 810–11 (9th Cir. 1994) ("When dealing with a series of lawsuits, the question is not whether any one of them has merit ... but whether they [were] brought ... not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"). However, these arguments ultimately are immaterial, because Defendants' alleged conduct clearly comes within the second exception to the *Noerr–Pennington* doctrine.

Finally, Defendants contend that speculative allegations of an anticompetitive settlement with STM do not suffice to state an antitrust injury. Ritz argues that even under the "plausibility" standard articulated in *Bell Atl. Corp. v. Twombly* plaintiffs alleging an unlawfully anticompetitive settlement agreement only are required to plead facts suggesting a "reasonable expectation" of wrongful conduct. Here, Ritz alleges that the patents were fraudulently obtained and that the settlement agreement entered between SanDisk and STM ratified STM's forced exit from the NAND flash memory market. Ritz expects that discovery will reveal further evidence of an illegal agreement.

Defendants point out that "the settlement of patent litigation, in and of itself, does not violate the antitrust laws." *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1220 (4th Cir.1976). "[T]he question is whether the underlying infringement lawsuit was objectively baseless ..." *In re Tamoxifen Citrate Antitrust Litigation,* 466 F.3d 187, 213 (2d Cir.2006) (internal citations omitted). However, if the patents asserted against STM were procured by fraud, there is a plausible inference that the purpose of the resulting settlement agreement was to extend Defendants' alleged monopoly. The Court concludes that Ritz has pled sufficient facts to establish an antitrust injury.[14]

### D. Conspiracy to Monopolize

■ Defendants claim that Count I of the FAC, which alleges conspiracy to monopolize, is subject to dismissal because as a matter of law SanDisk and Harari could not have formed a conspiracy with each other. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that a parent corporation and its wholly-owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act" because a parent and its wholly-owned subsidiary have a "complete unity of interest."); *See, e.g., Levi Case Co., Inc. v. ATS Prods., Inc.,* 788 F.Supp. 428, 430–32 (N.D.Cal.1992) (extending *Copperweld* to § 2 of the Sherman Act).

Ritz argues that *Copperweld* does not apply because Harari committed the improper conduct underlying the alleged conspiracy months before he founded SanDisk. FAC ¶¶ 94–96, 103 (alleging Harari filed initial patent applications based on misappropriated technology in April 1989, and founded SanDisk in June 1989). How-

---

**14.** Defendants argue that their refusal to deal with Ritz is a legitimate business decision, rather than anticompetitive behavior. Such factual disputes are not subject to resolution on a motion to dismiss.

ever, Ritz concedes in its opposition brief that the "June 1989" date is erroneous and that Harari founded SanDisk in June 1988. Opp. Br. at 4 n.1. In light of this concession, this aspect of Defendants' motion is well-taken.

## IV. ORDER

Having previously determined that triable issues of fact exist with respect to whether the crown jewel patents were procured fraudulently, the Court concludes that Ritz is entitled to pursue a *Walker Process* claim against Defendants. The Court also concludes that Ritz has pled fraudulent conduct and harm to competition with sufficient particularity and that Ritz has failed as a matter of law to state a claim for conspiracy to monopolize. Good cause therefor appearing, Defendants' motion to dismiss will be GRANTED IN PART, WITHOUT LEAVE TO AMEND as to Count I, and otherwise will be DENIED. Defendants' request for judicial notice also will be DENIED.